# No. 25-1340

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

FAIR ISAAC CORPORATION
*Plaintiff/Appellant,*

v.

FEDERAL INSURANCE COMPANY
AND ACE AMERICAN INSURANCE COMPANY
*Defendants/Appellees.*

Appeal from the U.S. District Court for the
District of Minnesota, No. 16-cv-1054
(Hon. Magistrate Judge David T. Schultz)

## REDACTED BRIEF OF PLAINTIFF-APPELLANT
## FAIR ISAAC CORPORATION

Heather Kliebenstein
Rachel Scobie
Paige S. Stradley
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
(612) 332-5300
hkliebenstein@merchantgould.com
rscobie@merchantgould.com
pstradley@merchantgould.com

Robert N. Hochman
  *Counsel of Record*
Nathaniel C. Love
Ellen A. Wiencek
Tyler M. Wood
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
rhochman@sidley.com
nlove@sidley.com
ewiencek@sidley.com
tyler.wood@sidley.com

*Counsel for Fair Isaac Corporation*

## SUMMARY OF THE CASE

A jury found that Defendant-Appellee Federal Insurance Company ("Federal") breached a contract with Plaintiff-Appellant Fair Isaac Corporation ("FICO"), and that Defendants-Appellees Federal and ACE American Insurance Company ("ACE") infringed FICO's copyrights covering FICO's software. That jury awarded FICO a combined $40 million in actual damages and advised the district court not to award disgorgement of Defendants' profits. The district court later ordered that FICO was entitled to no disgorged profits and ordered a new trial on actual damages unless FICO accepted a remittitur of the damages award to $6 million. FICO sought amendment of the remittitur to ███████████, and, when the court refused, FICO rejected the remittitur and the parties proceeded to a new trial. At the second trial, the district court significantly constrained the evidence considered by the jury. The second jury awarded FICO $3.725 million.

FICO respectfully requests 20 minutes of oral argument given the lengthy record in this case—the first trial lasted fifteen days, the second lasted six—and the many issues warranting the Court's attention.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Fair Isaac Corporation ("FICO") discloses that FICO, a Delaware Corporation, is not owned by any parent corporation, nor is there any publicly held company that owns 10% or more of FICO's stock.

**TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES ........................................................ 2

STATEMENT OF THE CASE ............................................................ 4

    A. FICO's Software ............................................................ 4

    B. Federal's And ACE's Copyright Infringement. ......................... 5

    C. The First Trial. .......................................................... 11

    D. The Jury's Disgorgement Ruling. ...................................... 18

    E. Post-Trial Actual Damages Rulings. .................................. 19

    F. The Second Trial. ........................................................ 23

SUMMARY OF THE ARGUMENT ...................................................... 26

ARGUMENT ............................................................................ 28

I. This Court Should Reinstate The Initial Jury Award Regarding Actual Damages ...................................................................... 28

    A. The hypothetical negotiation construct governs actual damages for copyright infringement. ...................................... 29

    B. The jury's $40 million award was amply justified. .................. 34

    C. The district court offered no legally valid basis for vacating the initial jury's award. .............................................. 39

        1. The district court misunderstood how the hypothetical negotiation guides a jury's actual damages ruling. ................ 41

        2. The court erred in concluding Waid's testimony had no probative value to the hypothetical negotiation. .................... 46

II.   Even If Remittitur Was Appropriate, FICO Was Entitled to a
      Reduction to No Less Than █████████. ..................................... 49

      A.   The district court failed to include maintenance and support
           fees all licensees must pay for FICO's product. ....................... 51

      B.   The district court failed to consider essential development
           components of FICO's license. .................................................. 53

      C.   The district court incorrectly valued Federal's and ACE's gross
           revenue. ..................................................................................... 57

III.  The District Court Erroneously Denied FICO Disgorged Profits
      Based on an Incorrect Legal Standard. .......................................... 60

      A.   The district court wrongly imposed a greater burden on FICO
           than is required by the Copyright Act. ..................................... 60

      B.   A jury should determine the amount of profits to disgorge. ..... 66

CONCLUSION ........................................................................................ 70

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*4DD Holdings, LLC v. United States,*
    169 Fed. Cl. 164 (Fed. Cl. 2023) ........................................................... 30

*Andreas v. Volkswagen of Am., Inc.,*
    336 F.3d 789 (8th Cir. 2003)........................................................ *passim*

*Aqua Shield v. Inter Pool Cover Team,*
    774 F.3d 766 (Fed. Cir. 2014) ........................................................ 30, 42

*Balsley v. LFP, Inc.,*
    691 F.3d 747 (6th Cir. 2012)............................................................... 62

*Berry v. Haw. Express Serv., Inc.,*
    2006 WL 1519996 (D. Haw. May 24, 2006) ...................................... 63

*Bertuccelli v. Universal Studios LLC,*
    2021 WL 2227337 (E.D. La. June 2, 2021) ........................................ 67

*Black & Decker Corp. v. Positec USA Inc.,*
    118 F. Supp. 3d 1056 (N.D. Ill. 2015).................................................. 68

*Capture Eleven Grp. v. Otter Prods., LLC,*
    2023 WL 5573966 (D. Colo. May 31, 2023)....................................... 67

*Cass Cnty. Music Co. v. C.H.L.R.,*
    88 F.3d 635 (8th Cir. 1996)................................................................. 68

*Dash v. Mayweather,*
    731 F.3d 303 (4th Cir. 2013)............................................................... 43

*ECIMOS, LLC v. Carrier Corp.,*
    971 F.3d 616 (6th Cir. 2020)............................................................... 63

*Feltner v. Columbia Pictures Television, Inc.,*
    523 U.S. 340 (1998) ............................................................................ 68

*Flying J, Inc. v. Cent. Cal. Kenworth,*
    45 F. App'x 763 (9th Cir. 2002) .................................................... 30, 52

v

*Fujifilm Corp. v. Benun,*
  605 F.3d 1366 (Fed. Cir. 2010) ........................................... 44

*Furnituredealer.net, Inc. v. Amazon.com, Inc.,*
  2022 WL 891462 (D. Minn. Mar. 25, 2022) ........................................ 61

*Gaylord v. United States,*
  777 F.3d 1363 (Fed. Cir. 2015) ......................................... 30, 31, 33, 48

*Georgia-Pac. Corp. v. U.S. Plywood Corp.,*
  318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................. *passim*

*Gibson, Inc. v. Armadillo Distrib. Enters., Inc.,*
  107 F.4th 441 (5th Cir. 2024), *as revised* (Aug. 8, 2024) .................... 47

*Honeywell Int'l Inc. v. ICM Controls Corp.,*
  2017 WL 374907 (D. Minn. Jan. 26, 2017) ........................................ 61

*Huffman v. Activision Publ'g, Inc.,*
  2021 WL 2339193 (E.D. Tex. June 8, 2021) ....................................... 67

*Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet &*
  *Lumber Co.,*
  195 F.3d 368 (8th Cir. 1999) ................................................. 66

*Jarvis v. K2 Inc.,*
  486 F.3d 526 (9th Cir. 2007) ......................................... 31, 43

*Laspata DeCaro Studio Corp. v. Rimowa GmbH,*
  2018 WL 3059650 (S.D.N.Y. June 20, 2018) ....................................... 52

*Leonard v. Stemtech Int'l Inc.,*
  834 F.3d 376 (3d Cir. 2016) ................................................. 33

*Lovett v. Union Pac. R.R. Co.,*
  201 F.3d 1074 (8th Cir. 2000) ............................................. 49

*Mackie v. Rieser,*
  296 F.3d 909 (9th Cir. 2002) ............................................. 43

*McCabe v. Parker,*
  608 F.3d 1068 (8th Cir. 2010) ...................................... 28, 49

*Minn. Supply Co. v. Raymond Corp.,*
 472 F.3d 524 (8th Cir. 2006) ............................................ 60

*Monohon v. BNSF Ry. Co.,*
 17 F.4th 773 (8th Cir. 2021) ....................................... 28, 45

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.,*
 2021 WL 6690279 (N.D. Ill. Dec. 14, 2021)................... 30, 31

*On Davis v. The Gap, Inc.,*
 246 F.3d 152 (2d Cir. 2001) ...................................... *passim*

*Oracle Corp. v. SAP AG,*
 765 F.3d 1081 (9th Cir. 2014)................................... *passim*

*Ouachita Nat'l Bank v. Tosco Corp.,*
 686 F.2d 1291 (8th Cir. 1982).......................................... 58

*Ouachita Nat'l Bank v. Tosco Corp.,*
 716 F.2d 485 (8th Cir. 1983)............................................ 49

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
 572 U.S. 663 (2014) ........................................................ 67

*Powell v. Home Depot U.S.A., Inc.,*
 663 F.3d 1221 (Fed. Cir. 2011) ........................................ 44

*Select Comfort Corp. v. Baxter,*
 996 F.3d 925 (8th Cir. 2021)............................................ 60

*Sid & Marty Krofft TV Prods., Inc. v. McDonald's Corp.,*
 562 F.2d 1157 (9th Cir. 1977), *overruled on other grounds*
 *by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led*
 *Zeppelin,* 952 F.3d 1051 (9th Cir. 2020) ........................... 67

*Spectralytics, Inc. v. Cordis Corp.,*
 650 F. Supp. 2d 900 (D. Minn. 2009), *aff'd in relevant*
 *part,* 649 F.3d 1336 (Fed. Cir. 2011) ................................ 48

*Static Control Components, Inc. v. Lexmark Int'l, Inc.,*
 697 F.3d 387 (6th Cir. 2012).............................................. 66

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015) .......................................... 32

*Thoroughbred Software Int'l, Inc. v. Dice Corp.*,
   488 F.3d 352 (6th Cir. 2007) .............................................. 52

*Tull v. United States*,
   481 U.S. 412 (1987) ........................................................... 68

*Tumey v. Mycroft AI, Inc.*,
   27 F.4th 657 (8th Cir. 2022) .............................................. 69

*Van Steenburgh v. Rival Co.*,
   171 F.3d 1155 (8th Cir. 1999) ................................ 29, 39, 45

*Wade v. Haynes*,
   663 F.2d 778 (8th Cir. 1981), *aff'd sub nom. Smith v.
   Wade*, 461 U.S. 30 (1983) .................................................. 46

*Westcott v. Crinklaw*,
   68 F.3d 1073 (8th Cir. 1995) .............................................. 47

## Statutes

17 U.S.C. § 504 .................................................................. *passim*

28 U.S.C. § 2106 ....................................................................... 67

## Other Authorities

U.S. Const. amend. VII ..................................................... 66, 68

Fed. R. Evid. 402 ...................................................................... 46

Fed. R. Evid. 403 ................................................................ 46, 47

H.R. Rep. No. 94-1476 (1976) ................................................. 68

5 Melville B. Nimmer and David Nimmer,
   Nimmer on Copyright (Matthew Bender, Rev. Ed.) .................... 52, 67

# JURISDICTIONAL STATEMENT

FICO sued Federal for breach of contract and both Defendants for copyright infringement. FICO's claims for copyright infringement arose under 17 U.S.C. § 101 *et seq.* The district court had federal question jurisdiction for the copyright claims under 28 U.S.C. §§ 1331 and 1338(a). The district court had supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

The district court issued a final judgment on January 21, 2025. R. Doc. 1594. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. FICO timely filed its notice of appeal on February 18, 2025. R. Doc. 1595.

## STATEMENT OF THE ISSUES

1.    Was the first jury's actual damages award a reasonable application of the hypothetical negotiation framework that should be reinstated?

- *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)

- *On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001)

- *Oracle Corp. v. SAP AG*, 765 F.3d 1081 (9th Cir. 2014)

- 17 U.S.C. § 504(b)

2.    Even if remittitur of the first jury's actual damages award had been appropriate, did the district court wrongfully reduce the award below what a reasonable jury could have awarded in light of the record?

- *McCabe v. Parker*, 608 F.3d 1068 (8th Cir. 2010)

- *Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291 (8th Cir. 1982), *on reh'g*, 716 F.2d 485 (8th Cir. 1983)

- 17 U.S.C. § 504(b)

3.    Did the district court erroneously deny FICO disgorgement of profits by imposing a legally excessive burden on the copyright holder to apportion the amount of profits attributable to the copyrighted work, and should a jury decide disgorgement in a retrial?

- *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789 (8th Cir. 2003)

- 17 U.S.C. § 504(b)

## STATEMENT OF THE CASE

### A.    FICO's Software.

FICO is a market leading analytics software company. It sells Blaze Advisor, a decision-rules management software system that enables companies to design, implement, and manage business decisions. Blaze Advisor empowers business users to author, test, deploy, and manage decision logic to reliably automate business processes. FICO maintains federal copyright registrations for Blaze Advisor to protect against unauthorized use of its software. App. 145; R. Doc. 1284, at 2.

Licensees use Blaze Advisor to execute and maintain rules-based business applications, including applications to help sell insurance. App. 647[1] (showing 10 of Defendants' applications that use Blaze Advisor for various purposes). Each time an application uses Blaze Advisor, the software must be copied onto the random-access memory

---

[1] Trial exhibits are not conveniently accessible on the district court's electronic docket. Relevant exhibits from the first trial are located at App. 224-962.

("RAM") of each server or computer that hosts the application. Trial Tr.[2] 635:13-19.

For insurance companies, applications using Blaze Advisor improve the speed of customer response, precision in pricing, and consistency in underwriting. They enable companies to respond faster to changing market conditions and regulations, scale to enable high-volume decisions, comply with company and regulatory requirements, and create an ease of doing business for agents and brokers which promotes the referral of insurance customers. Trial Tr. 2145:11-2147:24 (testimony of Defendants' expert William McCarter).

### B. Federal's And ACE's Copyright Infringement.

In February 2006, Chubb & Son, a division of Federal Insurance Company[3], sent FICO a Request for Information to learn about Blaze Advisor. Federal was seeking support for a "key strategic initiative" involving its Specialty Line of insurance products. At the time, Federal

---

[2] Citations to "Trial Tr." refer to the first trial transcript, which can be found at Docket Entries 5495097, 5495109, and 5495119.

[3] The 2006 License Agreement identifies the Client as "Chubb & Son, a division of Federal." We refer to the party to the agreement as "Federal" for simplicity.

planned to "expand[] and grow[] the business into mid-market and smaller accounts" through these Specialty Lines. App. 553. Federal knew that Blaze Advisor's automated decision-making was critical to facilitate the higher volume of transactions required by the mid-market, while also freeing time for its underwriters to focus on higher value opportunities supporting its growth and expansion. Trial Tr. 1023:2-24. (Blaze Advisor reduces the "time to market" for "new products and services" and increases analytical ability in the underwriting process). Blaze Advisor enabled the automatic renewal process for insurance policies, and Federal understood that the more "policies that are automatically renewed the more time the underwriter has to develop and produce additional business or handle additional business." App. 589; Trial Tr. 1023:2-1024:15, 1025:4-16.

On June 30, 2006, Federal entered into an agreement with FICO for a Blaze Advisor license in a single business application called CSI Express, which it used for underwriting and automated policy renewals. To obtain the license, Federal agreed to pay initially $199,813, reflecting $173,750 for the development and deployment license and $26,063 in minimum annual support and maintenance fees for the first

year. App. 538. The agreement provided that Federal would pay annual maintenance and support fees (which were subject to adjustment). That was universally the case for FICO's license agreements: every licensee promised to pay minimum guaranteed maintenance and support fees each year. App. 158, 164, 193; R. Doc. 1284, at 15, 21, 50.

On August 1, 2006, the parties expanded Federal's Blaze Advisor license from just one application to the entire Specialty Lines division. Federal agreed to pay $350,000, plus minimum guaranteed annual support and maintenance fees totaling $52,500 for the expanded license, for a total of $402,500. App. 544.

A few months later, Federal sought still greater expansion of its rights to use Blaze Advisor to support its strategic growth initiative. On December 28, 2006, the parties increased the scope of the license from division-wide to enterprise-wide. That meant Federal could deploy Blaze Advisor on applications in the insurance divisions for Commercial and Personal Lines in addition to Specialty Lines. Federal agreed to pay $1,300,000, plus a minimum of $195,000 in annual support and maintenance fees for this further expanded license. App. 546.

FICO worked extensively with Federal to develop and deploy Blaze Advisor across numerous applications. In nine years, Federal spent over $3.7 million across fifty-two separate statements of work for FICO's professional support services. Trial Tr. 587:6-10. By 2016, Federal had achieved its goal of expanding into mid-market and smaller accounts and was using Blaze Advisor across 16 applications connected to the sale of insurance. App. 576-84, 645-48. As the jury heard at trial, Blaze Advisor had become core to Federal's business. App. 140; R. Doc. 1282, at 35; Trial Tr. 2137:22-2140:18.

On January 15, 2016, Federal was acquired by another, larger, property and casualty insurance company that operated under the name ACE Insurance. Federal underwent a change of control. ACE INA Holdings, Inc., a wholly owned subsidiary of ACE Limited, became the parent of Federal. App. 39-40; R. Doc. 1072 ¶¶ 9, 12, 15. Following the merger, the Chubb Corporation (the former parent of Federal and its division Chubb & Son) ceased to exist, and ACE Limited changed its name to Chubb Limited. *Id.* ¶¶ 13-14. The merger was "the largest merger in insurance history," resulting in a new company with $35

billion in annual revenue, nearly three times the annual revenue of Federal at the time of the merger. *Id.* ¶¶ 11, 18-19; App. 226.

Chubb Limited faced a problem. Under Federal's license agreement to use Blaze Advisor, the change in control was "deemed to be an assignment" of the license to use Blaze Advisor, and Federal could not assign that license, which it had deployed throughout its business, without FICO's written consent. App. 535. Prior pricing for Federal's license, like all FICO's licenses, took account of the size of its customer's business and the value it would bring the customer. App. 956 (FICO's Global Price List, reflecting fee tiers based on a licensee's revenues). The larger the business and value, the larger the price. FICO recognized soon after the public announcement not only that Federal would need a new license, but that licensing terms would accordingly change to align with the increase in the volume of the business. Trial Tr. 403:1-404:8.

FICO attempted to connect with Federal in December 2015, before the merger even closed. It continued to follow up thereafter, including by sending the prior licensing agreements for review to "start the discussions and process to ensure [Chubb and Federal] remain in

compliance with [the] license and have the license grants necessary to support the organization post transaction close." App. 219; R. Doc. 401-23, at 3. Federal staff never responded to FICO's email or attempted follow up. Trial Tr. 2015:1-15.

Without another path forward, FICO gave notice of breach of its license on January 27, 2016, while again inviting negotiations to reach a business resolution. App. 216; R. Doc. 401-22. The parties' negotiations, however, were unsuccessful, and FICO terminated the agreement, effective March 31, 2016. App. 223; R. Doc. 401-24.

Federal had at least two months, after FICO took the position that Federal no longer had a license, to consider how to carry on its business without Blaze Advisor. In fact, given that plans for the merger had been underway since at least the summer of 2015, Federal had an even longer runway to plan for continuing its business without Blaze Advisor. Trial Tr. 361:20-25.

In the end, Federal simply continued using Blaze Advisor across 16 applications building its success in the mid- and small-markets, all while knowing FICO considered such use unauthorized. App. 217; R. Doc. 401-22, at 3. ACE, a new and separate entity, started using the

software on January 1, 2017 having *never* had a license. Trial Tr. 2703:5-7; App. 213-14; R. Doc. 124 (John Taylor Dep. Tr.), at 75:17-76:3; 78:16-21. Put simply, Defendants chose to take FICO's copyrighted software and pay *nothing* for it going forward.

## C. The First Trial.

FICO sued Federal less than one month after terminating the agreement, R. Doc. 1, and later amended the complaint to assert claims against ACE. R. Doc. 132. FICO claimed breach of contract and copyright infringement and demanded a jury trial. *Id.*

The jury found that Federal breached the license agreement and that Federal and ACE infringed FICO's copyright. App. 73; R. Doc. 1173. Those findings are no longer subject to dispute. The only questions here concern remedies. The jury awarded $40 million in actual damages and recommended to the district court that no disgorgement of profits be awarded (the jury provided an advisory verdict on disgorgement even though FICO had asked for a binding jury determination on the issue). *Id.*

To determine FICO's actual damages for copyright infringement and breach of contract, the jury was instructed that "[t]he fair market

value is the license fee that a willing buyer and willing seller would have negotiated for the allegedly improper or infringing use that was made." Trial Tr. 2615:11-14. This so-called hypothetical negotiation "focus[es] on what the expectations of the licensor and the alleged infringer would have been had they entered into an agreement at that time … ." *Id.* 2615:19-23.

To inform the jury's consideration, FICO presented evidence of Federal's and ACE's extensive use of Blaze Advisor to underscore the high value of the software to Defendants. Testimony from FICO employees who helped install Blaze Advisor across 16 applications demonstrated that the software "was central to all of [Defendants'] decision-making process within the group" and "pivotal to what they were doing." *Id.* 162:24-163:7. Defendants' own witnesses admitted that Blaze Advisor was employed in various "core" administrative systems used to process automatic renewals, *id.* 2137:22-2140:18, 2142:19-24, and that Blaze Advisor brought products to market faster, increased the percentage of policy renewals, and better responded to changing market conditions, *id.* 1021:11-22, 1023:19-1024:2, 1028:15-19, 1032:5-7.

Defendants succeeded in entering into the mid- and small-markets, a feat that had not been possible before use of Blaze Advisor.

Before the jury, Defendants told a story different from what their internal documents stated. They asserted that Blaze Advisor was not unique, and that it could be easily replaced by cheaper alternatives. *Id.* 688:12-689:4, 1050:10-1052:11, 1157:4-1158:2, 2667:9-2668:17. But the jury also knew that Defendants continued to use Blaze Advisor without a license, rather than switch to an alternative, for approximately four years *after* the license terminated. *Id.* 1050:23-1051:5, 2445:12-2446:9. That is, the jury knew that Federal and ACE were in fact *unable* and *unwilling* to shift to any alternative software quickly. The jury had ample basis to conclude that use of Blaze Advisor was a key—and, in fact, essential—part of Defendants' insurance business.

Testimony from FICO executive William Waid provided extensive detail about FICO's policies and practices regarding licensing Blaze Advisor. Waid had personal experience directing pricing negotiations for hundreds of Blaze Advisor licenses throughout his career at FICO. *Id.* 1683:24-1684:17.

Waid explained FICO's 2003 Global Price List, *id.* 1685:2-1688:25, 1721:1-7; App. 956, and tiered pricing models, including the significance of enterprise licensing and application-based pricing. Notably, while FICO had originally used enterprise-based licenses, as it did in Federal's 2006 agreement, by 2010 FICO had started shifting to an application-based model. Waid testified to this shift, Trial Tr. 1634:1-1635:3, 1685:21-1686:4, 1737:19-1738:9, 1822:19-1823:2, which was uncontroverted, and FICO introduced evidence of an application-based license with RGA Technology Partners. *Id.* 1829:2-20; App. 769-95. That license covered use of Blaze Advisor in one application and was sold in 2019 for ████████. Trial Tr. 1828:21-1829:15.

In addition to evidence of its licensing practices, FICO presented evidence of the negotiating environment that would have prevailed had Federal not used the copyrighted software without an agreement. FICO's pricing models in 2016 would have taken into consideration the size of the new entity, the extent of use of Blaze Advisor, and its incorporation into the business that had already taken place. Recall Federal had significantly expanded its use of Blaze Advisor in the ten years in which it had a relationship with FICO. The prospect of further

expansion would also have played a role in the negotiations. *Id.* 1724:14-1741:5. Indeed, ACE allowed over a dozen new subsidiaries under its management to use Blaze Advisor, as well. *Id.* 35:23-25.

In addition, in the ten years since Federal had been using Blaze Advisor, the software's position in the marketplace had changed significantly. Waid explained that FICO had discounted aggressively in the early years of Blaze Advisor, but that FICO began to pull back on discount offers starting in 2010, as Blaze Advisor gained market share. *Id.* 1634:1-1635:3. By 2016, Blaze Advisor had become the market leader in business rules management system software and FICO no longer needed to discount aggressively. *Id.* 1632:8-1633:24, 1689:20-1690:19, 1634:18-1635:3, 1691:3-24. In early 2016, Federal employees recommended Blaze Advisor as their "technology of choice for business rules" for the merged entity, App. 618, beating out other software, App. 627.

The jury heard that FICO has long considered the prospect of ongoing business relationships when negotiating license agreements. For example, discounting was commonplace between approximately 2006 and 2016 because FICO was building the market for Blaze Advisor

and sought to establish long-term relationships. Trial Tr. 1632:8-1635:3, 1742:5-11, 1742:20-1744:18. The prospect of a long-term business relationship plays a key role in its pricing practices, as well as impacting the duration and scope of a license. *Id.* 1657:16-23, 1741:21-1742:19, 1743:12-1745:12.

As Waid explained, in the "hypothetical negotiation" here, which assumed a short-term license for merely four years, FICO had a significantly reduced incentive to discount Defendants' license. *Id.* 1741:16-1742:19. Similarly, Waid explained that FICO would oppose providing a broader, enterprise-wide license under its discounted pricing model for a license covering only a term of years. *Id.* 1685:21-1686:4, 1737:11-1738:9, 1822:19-1823:2. Instead, FICO would have had a strong incentive to negotiate for an application-based pricing model in such circumstances. *Id.*

Taking all these factors into consideration, the jury heard ample evidence that the hypothetical negotiation it had to construct would have been significantly different from FICO's past experience, shaped by the unique circumstances of Federal's and ACE's dependence on Blaze Advisor, and timed with the beginning of an era of market-

leading success of the software. Waid estimated that FICO's pricing methodology in 2016 would have led to a license fee ranging from $30 to $50 million for 16 separate uses in 16 applications, which Waid explained would serve only as a starting place for FICO's negotiation position. *Id.* 1736:22-25, 1738:2-1741:5.

Federal and ACE urged the jury to give dispositive weight to the license history stretching back in time to the early days of introducing Blaze Advisor to the marketplace. *Id.* 1811:24-1821:20, 2655:3-6. But, as Waid explained, there were significant differences between the market circumstances that prevailed at the time of those negotiations. As noted above, FICO was introducing Blaze Advisor to the marketplace at the time of those early licenses, and thus had strong incentives to discount. And those licenses were based on an expectation of a longstanding business relationship, so the enterprise-wide model generally prevailed. *Id.* 1632:8-1635:3, 1742:5-11, 1742:20-1744:18. In addition, many of these purportedly comparable licenses covered a scope far different than that used by Federal and ACE, making any comparison to these licenses inapt. *Id.* 1815:2-1816:20, 1831:12-1832:11, 1836:1-1837:7.

The jury awarded $4.3 million in damages for Federal's breach and copyright infringement (from March 31, 2016 to December 31, 2016), and $35.7 million for ACE's infringement (from January 1, 2017 forward), for $40 million total actual damages.[4] App. 73; R. Doc. 1173.

## D. The Jury's Disgorgement Ruling.

FICO also sought to disgorge Federal's and ACE's profits attributable to their infringing use of Blaze Advisor. Though FICO demanded a jury trial for its claim to disgorgement of profits, the district court struck FICO's demand, R. Docs. 588, 811, and posed the question to the jury in an advisory capacity, R. Doc. 935. The district court instructed the jury, over FICO's objections, that it was FICO's burden to establish a "causal nexus" between Federal and ACE's infringement and their profits, to establish grounds for a disgorgement of profits award. App. 68; R. Doc. 1167, at 25; Trial Tr. 2559:20-2565:11.

---

[4] As the district court instructed, the jury's award for both breach of contract and copyright infringement was evaluated collectively based on "the fair market value of a license to use Blaze Advisor," as determined by "the license fee that a willing buyer and a willing seller … would have agreed to in a hypothetical negotiation for a license covering the allegedly infringing use that was made." Trial Tr. 2615:9-18; App. 74; R. Doc. 1173, at 2.

During trial, FICO presented evidence that Federal and ACE admitted more than $21 billion in gross written premium for insurance policies in connection with which Blaze Advisor software was used. App. 649-80; Trial Tr. 1893:25-1898:16 (testimony of CFO for Chubb's North America operations confirming that the gross written premiums identified in Interrogatory No. 17 was the gross written premium that ran through various applications that used Blaze Advisor); Trial Tr. 1261:6-8 (testimony of FICO's expert). Federal and ACE declined to present any evidence of how much of that revenue was attributable to other factors separate from the "core" role that Blaze Advisor played in their operations. App. 77; R. Doc. 1275 (Defendants' Proposed Findings of Fact).

The jury ultimately recommended against disgorging any profits. The district court later agreed with the jury. App. 142; R. Doc. 1282, at 37.

### E. Post-Trial Actual Damages Rulings.

After Federal and ACE moved for a new trial on actual damages, the district court remitted the jury's actual damages award to

$6 million and ordered a new trial if FICO declined to accept the remitted amount. App. 144; R. Doc. 1284.

The district court asserted that Waid's testimony merely explained what FICO subjectively would have wanted from a license agreement. App. 180-87; R. Doc. 1284, at 37-44. To the district court, such evidence of the copyright holder's perspective in negotiations would prejudice the jury's evaluation of how the hypothetical negotiation would have determined the copyrighted material's fair market value. App. 181-82; R. Doc. 1284, at 38-39, 44.[5] The district court agreed that "Waid had the requisite personal knowledge to testify," based on his "experience pricing Blaze licenses, negotiating with buyers, and utilizing FICO's internal practices in doing so." App.

_____

[5] The district court had prior to trial excluded the testimony of FICO's damages expert. R. Docs. 731, 1065. The district court believed that the damages calculations the expert proposed to present to the jury did not satisfy the standards for expert testimony and thus would not assist the jury. R. Doc. 731, at 30-32. The district court believed the expert offered only to quantify what FICO would have preferred to have charged a licensee, rather than calculate the fair market value of the license through a hypothetical negotiation. *Id.* at 32. The court did, however, admit at trial testimony from FICO's fact witness to cover FICO's pricing practices. App. 155-156; R. Doc. 1284, at 12-13. The exclusion of the expert testimony is not challenged on appeal.

182; R. Doc. 1284, at 39. But the district court also decided that Waid failed to "connect that pricing practice to the market for Blaze" Advisor, and that ultimately his testimony "had *no* probative value." App. 183, 187; R. Doc. 1284, at 40, 44.

The court simply never discussed the various market factors that Waid explained both parties would have recognized (recounted above). Instead, the court considered only evidence of actual past licenses as relevant to what it referred to as the "objective" market value of Blaze Advisor. App. 198-201; R. Doc. 1284, at 55-58. Because FICO had not faced a business negotiation with the dynamics that would have been present in the hypothetical negotiation here, it was true that, as the district court observed, "FICO had never sold an application-based license for 15 applications, nor sold a Blaze license to anyone for $40 million." App. 183; R. Doc. 1284, at 40. The district court acknowledged that it was "true the economic circumstances in 2016 were different," but nonetheless concluded there was "little to *no* objective evidence on which the jury could find the fair market value of the hypothetical license, aside from the parties' 2006 License Agreement itself." App. 198-99; R. Doc. 1284, at 55-56. That is, the court

ruled the "hypothetical negotiation" should, as a matter of law, exclude any unique market circumstances that would have prevailed and impacted the negotiation because only a track record of actual licenses will suffice. App. 191-205; R. Doc. 1284, at 48-62. Instead, the trial court determined that a $6 million, enterprise-wide license without any annual minimum maintenance and support was the most a jury could reasonably award. App. 207-08; R. Doc. 1284, at 64-65.

FICO requested that the remitted award be raised. R. Doc. 1298. Undisputed evidence proved that *no* license had ever been awarded unless a customer agreed to pay guaranteed minimum maintenance and support fees. FICO explained the remitted award should likewise include amounts reflecting such fees. *Id.* at 3-4 (citing App. 158, 193; R. Doc. 1284, at 15, 50). Based on the district court's determination of a $6 million fee—correcting for the court's use of an incorrect revenue number, as well as its exclusion of both development license fees and support and maintenance fees—the jury could have arrived at ███████████ in actual damages even if it had agreed with the trial court's view that an enterprise-wide, perpetual license structure was the *only* reasonable result of the hypothetical negotiation. R. Doc. 1298,

at 20 (illustrating FICO's proposed amended award by component). The district court denied that motion, App. 209; R. Doc. 1330, and FICO rejected the $6 million remitted amount, R. Doc. 1338.

## F. The Second Trial.

The second trial concerned only actual damages owed for Defendants' combined infringing use of Blaze Advisor.[6] App. 208; R. Doc. 1284, at 65. But in a variety of rulings that reinforced the district court's narrow view of how a jury should evaluate evidence of the hypothetical negotiation, the district court all but guaranteed that the second jury could not exceed the court's remitted $6 million award.

For example, FICO was prohibited from referencing the first jury's findings of breach of contract or copyright infringement. Instead, the jury was instructed that the first trial was a "genuine commercial dispute" over an "ambiguous" contract. June 10, 2024 Trial Tr. (D.E. 5497804), at 262:21-24, 263:7-12. The court did not explain why any supposed "ambiguity" in the contract could matter from the point of

---

[6] Despite Federal and ACE being separate legal entities and separate, unchallenged findings of infringement as to each, the district court, over FICO's objection, refused to allow the jury to award separate amounts for Federal's and ACE's separate infringements.

view of the hypothetical negotiation. The second jury was also prohibited from hearing evidence of how Federal's internal documents showed its importance to its business, depriving it of substantial evidence concerning value and import of Blaze Advisor to Federal and, consequently, the negotiating strength of the parties at the time of the hypothetical negotiation. June 7, 2024 Tr. (D.E. 5495194), at 36:14-19 (excluding evidence of the benefits Defendants receive from Blaze Advisor); May 16, 2024 Pretrial Tr. (D.E. 5495187), at 117:11-118:5 (excluding evidence of the number of insurance policies processed using Blaze Advisor).

FICO was also precluded from presenting evidence of its application-based pricing. *See* May 16, 2024 Pretrial Tr. (D.E. 5495187), at 46:6-8. Nor could it enter evidence of maintenance and support fees or evidence showing the burden on Federal and ACE to remove Blaze Advisor from their applications. *See* June 7, 2024 Tr. (D.E. 5495194), at 9:6-23; May 22, 2024 Tr. (D.E. 5495190), at 33:23-34:4.

Unsurprisingly given how the second jury was kept ignorant of the actual market circumstances that would have prevailed between the two parties, the second jury awarded $3.725 million in actual damages.

App. 210; R. Doc. 1486. The court entered final judgment on January

21, 2025. R. Doc. 1594.

## SUMMARY OF THE ARGUMENT

The district court's rulings following the initial jury's award, expanded into its rulings confining the second trial, reflect a consistent pattern that rejects both the jury's role in determining actual damages and the legal framework the law imposes for the jury to reach its award. The district court erroneously displaced the legitimate exercise of discretion and judgment that belongs to the jury with its own.

The initial jury award should never have been remitted. And even if it had been, it should not have been remitted below the more than █████ that FICO requested in its motion to amend. Finally, this Court should remand for a new trial limited to disgorgement, so that FICO's right to that relief may be evaluated under the proper legal standard.

1. This Court should vacate the judgment and remand the case to the district court with instructions to enter judgment on the initial jury's actual damages amount of $40 million. That award reflects a reasonable application of the hypothetical negotiation framework. The specific negotiating circumstances the jury properly heard amply support an application-based pricing model for the 16 applications that Defendants used without authorization. The district court rejected an

application-based pricing award based on an erroneous and cramped view of the hypothetical negotiation framework. The law does not place the dispositive weight on a copyright holder's prior license agreements that the court imposed, especially when those agreements do not reflect comparable circumstances to those that would have prevailed at the time of the hypothetical negotiation. Likewise, the law does not constrain the jury from hearing the parties' perspectives regarding the value of the copyrighted material and its importance to Defendants' business. To the contrary, the jury could not reproduce a hypothetical negotiation without such evidence.

2. In the alternative, and at minimum, this Court should instruct the district court to enter judgment for no less than ██████, which, viewing the evidence as the district court did, is the maximum amount a jury would have reasonably awarded. FICO's software copyright license agreements have uniformly included fees for maintenance and support and for development licenses and are calculated (in part) on the total revenues of the customer's business. The trial court offered no reason why the jury could not have credited those amounts.

3. The Court should vacate the district court's order awarding no disgorgement of profits. That ruling is based on an erroneous view of FICO's legal burden, which requires only that a copyright holder prove that the copyrighted work had some connection to the defendants' profits. The statute places the burden on the defendants to apportion the amount of profits that were attributable to other, noncopyrighted features. The district court imposed an excessive burden on FICO and shifted responsibilities that belong to Defendants onto the copyright holder. Further, the new trial on disgorgement should take place before a jury and not the court.

## ARGUMENT

## I.   This Court Should Reinstate The Initial Jury Award Regarding Actual Damages.

This Court reviews a "conditional grant of a new trial, and offer of a remittitur, for an abuse of discretion." *McCabe v. Parker*, 608 F.3d 1068, 1079-80 (8th Cir. 2010). It is an abuse of discretion to grant a new trial based on an erroneous view of the law. *See Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 784 (8th Cir. 2021). This includes legally erroneous views of the evidence. The district court "may not usurp the role of the jury by granting a new trial simply because it believes other inferences

and conclusions are more reasonable." *Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1160 (8th Cir. 1999).

### A. The hypothetical negotiation construct governs actual damages for copyright infringement.

Under the Copyright Act, a "copyright owner is entitled to recover the actual damages suffered … as a result of the infringement." 17 U.S.C. § 504(b). Actual damages measures all of a plaintiff's losses due to the infringement based upon the revenue that would have accrued to the plaintiff but for the infringement, and are "broadly construed to favor victims of infringement." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 164 (2d Cir. 2001) (citing William F. Patry, *Copyright Law and Practice* 1167 (1994)).

A copyright plaintiff should receive the fair market value for agreeing to license its copyrighted work. App. 177-78; R. Doc. 1284, at 34-35. *See also Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014); *On Davis*, 246 F.3d at 166. The purpose of actual damages is both to ensure that the victim of infringement is restored to the position it would have occupied had the defendant committed no wrong, and to ensure that a defendant does not benefit from its wrong. *On Davis*, 246

F.3d at 166; *Flying J, Inc. v. Cent. Cal. Kenworth*, 45 F. App'x 763, 766 (9th Cir. 2002).

Juries determining fair market value of a license are asked to construct a "hypothetical negotiation" of what a willing buyer would have paid a willing seller for the copyrighted work. *See Oracle*, 765 F.3d at 1087. Certain assumptions undergird this hypothetical negotiation. The law assumes both parties are willing to enter an agreement. *Id.* And the law also assumes that the negotiation would take place at the time infringement first occurred. *Gaylord v. United States*, 777 F.3d 1363, 1367 (Fed. Cir. 2015).

While those assumptions are fixed, the hypothetical negotiation is designed to be flexible. A jury may consider the circumstances relevant to an actual negotiation, including what have become known as the fifteen *Georgia-Pacific* factors.[7] *See Georgia-Pac. Corp.*, 318 F. Supp. at

---

[7] The *Georgia-Pacific* factors began as a tool to analyze "the amount of a reasonable royalty for a patent license." *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). They are now routinely used to guide courts assessing analogous copyright damages. *See, e.g.*, *4DD Holdings, LLC v. United States*, 169 Fed. Cl. 164, 186 (Fed. Cl. 2023); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 2021 WL 6690279, at *6 (N.D. Ill. Dec. 14, 2021); *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771 n.1 (Fed. Cir. 2014).

1120; *Gaylord*, 777 F.3d at 1367-68, 1371 (analyzing copyright damages using *Georgia-Pacific* and other "common-sense" factors); App. 65; R. Doc. 1167, at 22 ("In considering this hypothetical negotiation, you should focus on what the expectations of the licensor and the alleged infringer would have been had they entered into an agreement at that time.").

The goal is to capture the inherent individual circumstances that govern any arms-length negotiation, and ensure that the jury understands the individual parties' commercial needs and business plans, all of which would shape an actual negotiation. *See Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007) (affirming actual damages award reflecting "the financial perspectives of both the willing buyer" and "the willing seller" "at the hypothetical time of sale"). Importantly, the hypothetical negotiation provides a mechanism for the jury to objectively determine a copyright holder's actual damages, *Motorola Sols.*, 2021 WL 6690279, at *6, but the *Georgia-Pacific* factors themselves often involve witnesses offering their subjective understandings. *See, e.g.*, *Gaylord*, 777 F.3d at 1367-68 (explaining the "use of objective considerations" means the "court is not constrained to

accept particular practices of the parties on either side," including by "shield[ing] infringers from paying fair market value for what they took") (cleaned up). It could not be any other way. Constructing a hypothetical arms-length negotiation necessarily involves understanding the competing subjective ways the parties value the product and their perceptions of each other's need for an agreement. It also involves the jury evaluating the strengths and weaknesses in bargaining positions that would enable one side to be more likely to give ground than the other.

This is common sense as the *Georgia-Pacific* factors themselves confirm. Those factors include evidence of the "extent to which the infringer has made use" of the product, which informs the jury about how the parties may have valued the copyright during the hypothetical negotiation. *Georgia-Pacific Corp.*, 318 F. Supp. at 1120 (including "any evidence probative of the value of that use"); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1298 (Fed. Cir. 2015) ("[A]n invention used more frequently is generally more valuable than a comparable invention used infrequently." (citation omitted)). The factors also include the product's "commercial success," *Georgia-Pacific*

*Corp.*, 318 F. Supp. at 1120, and other factors informing a licensee's "strong economic incentive" to accept, for example, a higher fee based on the product's "appreciable indirect economic benefits," *Gaylord*, 777 F.3d at 1371.

The law also requires the jury to give due consideration to the prior comparable licensing agreements covering the copyrighted work. *See Gaylord*, 777 F.3d at 1368 (recognizing "the use of past licenses as evidence"). But a mere list of prior licensing agreements is not automatically informative. What matters is the extent to which prior licenses are *comparable*. *See Georgia-Pacific Corp.*, 318 F. Supp. at 1120. A jury may accordingly take account of any changes in commercial circumstances between the date of the prior license and the hypothetical negotiation date. *See, e.g.*, *Gaylord*, 777 F.3d at 1371-72 (explaining that "past licenses … containing a much lower royalty" are not determinative because they are "easily [] found to be quite different for licensing purposes"); *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 390-91 (3d Cir. 2016) (explaining the fair market value approach is more appropriate than analysis of past licensing fees, alone).

Ultimately, just as in a real negotiation, the jury must consider all factors and may not treat any one as controlling.

## B. The jury's $40 million award was amply justified.

The jury's $40 million actual damages award was comfortably within the range of what the law allows.

Evidence submitted by both sides demonstrated the "extent to which [Federal and ACE] made use of the invention" and "evidence probative of the value of that use." *Georgia-Pacific Corp.*, 318 F. Supp. at 1120 (factor 11). Testimony from FICO employees who helped install Blaze Advisor across 16 applications explained that the software "was central to all of [Federal's and ACE's] decision-making process[es] within the group" and "pivotal to what they were doing." Trial Tr. 163:2-7. Federal's witnesses, too, admitted that Blaze Advisor was employed in various "core" administrative systems used to process automatic renewals, and that Blaze Advisor brought products to market faster, increased the percentage of policy renewals, and better responded to changing market conditions. *Id.* 986:25-988:3, 995:5-999:13, 2137:22-2140:18, 2142:19-24; App. 589, 616. The jury understood that Federal adopted Blaze Advisor in more lines of

business in the years leading up to ACE's acquisition. The jury knew Defendants themselves had, when planning for the integration of the new company, stated that "Blaze Advisor is the preferred choice for rules engine." App. 627. In short, the jury heard substantial evidence that, by the time of the hypothetical negotiation in 2016, Blaze Advisor had been woven extensively into an array of Defendants' profitable businesses.

Moreover, real world confirmation of the importance of Blaze Advisor to Federal's business was before the jury. Federal and ACE continued to use Blaze Advisor for several years *after* Federal received notice of termination from FICO. To be sure, Defendants told the jury that Blaze Advisor was not important to their business, that other software could readily have been acquired and deployed to achieve similar ends, and that therefore they would have no incentive to yield when FICO insisted on an application-based license structure. Trial Tr. 688:12-689:4, 1050:10-1052:11, 1157:4-1158:2, 2655:15-2656:3. But the jury reasonably gave such testimony little weight. Based on the evidence, the jury knew that Federal and ACE were either unwilling or

unable to shift to an alternative, and instead took FICO's copyrighted material for nothing.

The jury likewise heard why FICO would have insisted, in 2016, on an application-based pricing model that was the foundation of what FICO requested from the jury. Waid testified about FICO's historic pricing models, and explained how those models evolved in light of Blaze Advisor's success in the marketplace and general changes in industry preferences by the time of the hypothetical negotiation. Waid discussed how FICO would size a customer's applications as small, medium, large, or very large using FICO's Global Price List, with each size corresponding to a different price point. App. 955. Based on the pricing guide, the number and size of applications informed FICO's starting point for negotiation. Trial Tr. 1695:14-21, 1713:2-1723:21, 1724:14-1741:5.

The jury also heard that the "duration" and "term of the license" that a customer was seeking mattered. FICO had two types of license grants—annual (also referred to as a term license) and perpetual. *Id.* 1685:21-1686:6, 1686:12-1687:11. Perpetual enterprise licenses were common in the early life of Blaze Advisor so that FICO could collect

larger up-front revenue. *Id.* 1737:11-24. But that pricing model became less common after 2010, and by 2016 both the market and FICO had moved toward annual or term-based licenses on an application basis. *Id.* 1737:24-1738:7. In 2016, a customer like Federal or ACE, unwilling to enter into a mutually beneficial long-term relationship, would have little ability to cause FICO to abandon an application-based licensing structure.

In the end, the business circumstances the parties faced in 2016 would have most likely produced an application-based, term license in 2016. *Id.* 1731:19-1732:21. Waid suggested that taking all the circumstances into account, a license agreement of roughly $35 million would be the starting point for negotiation, and that the circumstances of the negotiation could readily result in a lower or higher license agreement depending on the parties' relative positions. *Id.* 1695:19-21, 1697:14-16, 1741:8-11; 1741:21-1746:14.

It is true that Defendants focused largely on FICO's prior licenses, but FICO had explained they were not comparable. Waid discussed how FICO had changed its discounting practices as Blaze Advisor gained market share. *Id.* 1634:1-1635:3. By 2016 Blaze Advisor had become the

market leader in business rules management system software and Waid confirmed that licensees at that time would no longer receive the kind of discounts that FICO had years earlier provided to customers. *Id.* 1632:8-1633:24, 1689:20-1690:19, 1691:18-24; 1634:18-1635:3; 1691:3-24. The prior licenses were adopted years before the hypothetical negotiation date, when materially different business circumstances had prevailed. Moreover, prior negotiations could not capture how important Blaze Advisor had become to a broad swath of Defendants' business. None of the prior licenses involved businesses who had already fully integrated Blaze Advisor into their systems, reaped those benefits, and come to recognize the software as the rules management system product of choice.

The jury considered all the evidence and was instructed that the "license fee you determine must be a fee that would have resulted from the hypothetical negotiation, not simply a fee either party would have preferred." App. 65; R. Doc. 1167, at 22. The jury appropriately awarded FICO $40 million in actual damages.

## C. The district court offered no legally valid basis for vacating the initial jury's award.

The district court's post-trial ruling vacating the jury award rests on legal errors regarding the hypothetical negotiation. First, the district court repeatedly stated that the hypothetical negotiation model allows a jury to consider only "objective" evidence of a copyrighted work's fair market value. Second, and following from that error, the district court excluded significant portions of Waid's testimony—primarily his testimony regarding application-based pricing—that fit squarely within the hypothetical negotiation framework the jury properly applied. The result was a ruling that fundamentally deprived the jury of its role and allowed the district court's own personal view about how to value Blaze Advisor to prevail over the jury's view. *Van Steenburgh*, 171 F.3d at 1160 (stating that just because a judge "believes other inferences and conclusions [from the record] are more reasonable" is no reason to vacate an award).

The district court's ruling here, if allowed to stand, would have perverse consequences for copyright law (and damages in all intellectual property disputes). According to the district court, a customer can simply take protected material confident that it will *never*

be required to pay more than any prior license. Indeed, the potential infringer would be incentivized to infringe rather than negotiate in good faith. After all, if copyrighted work like Blaze Advisor becomes popular and more desirable than in years past, or if the customer values the product substantially more than those who came before it, or if the customer would find it particularly costly to abandon the product and find a substitute, or any other factor that might impact an actual arm's-length negotiation in a manner that would produce a favorable outcome for the copyright owner, the customer would be better off infringing. The law should plainly discourage rather than encourage infringement. *On Davis*, 246 F.3d at 165-67.

The jury understood that Defendants infringed because they did not want to pay a negotiated license fee that accounted for the true value to Defendants of Blaze Advisor. Defendants took a chance by stealing copyrighted material after their license had been terminated. They were wrong to do so, and now the district court's order rewards them for it. That is not and should not be the law.

### 1. *The district court misunderstood how the hypothetical negotiation guides a jury's actual damages ruling.*

The district court repeatedly stated, as a matter of law, that a jury should be allowed to consider only what it referred to as "objective" evidence of a work's market value. App. 194; R. Doc. 1284, at 51 ("It is plain that none of … the objective evidence" supported the verdict); *id.* (explaining FICO's evidence was "too vague, imprecise, or speculative to bridge the gap between the objective evidence of value and the verdict"); App. 199; R. Doc. 1284, at 56 ("there would be little to *no* objective evidence on which the jury could find the fair market value" without evidence of pre-2016 licensing agreements); App. 200; R. Doc. 1284, at 57 ("FICO [] failed to provide benchmark licenses similar enough for a jury to approximate FICO's actual damages based on objective evidence."); App. 201; R. Doc. 1284, at 58 ("[T]here was no objective evidence on which the jury could have properly reached its $40 million figure."); App. 207 n.61; R. Doc. 1284, at 64 n.61 (explaining there is "only one objective conclusion," leading to $6 million remittitur amount). Indeed, it went so far as to declare that evidence that speaks *directly* to some of the *Georgia-Pacific* factors is "subjective" evidence

without any probative value in determining actual damages. App. 195; R. Doc. 1284, at 52 (dismissing "testimony characterizing Blaze's contribution to Federal's (and others') business as 'significant'" as "subjective").

The district court's approach cannot be squared with the law. The hypothetical negotiation is a holistic exercise that asks the jury to consider "all relevant record evidence" informing what a party's "expectations would have been in a hypothetical negotiation." *Aqua Shield*, 774 F.3d at 773. To be sure, the hypothetical negotiation does not allow speculative or baseless jury awards, *On Davis*, 246 F.3d at 166-67, but it is designed to ensure that a jury has all the information it needs to make a reasonable assessment of how an *actual* negotiation might have yielded an *actual* license, thus ensuring that the copyright holder is *not* made worse off as a result of infringement, *id.* at 165-66. The law does not expect that an *actual* negotiation would take place free of the competing *subjective* positions of the parties. The point of any negotiation is to find a reasonable compromise between the actual counterparties' views.

The district court considered only what it perceived as "objective" evidence of how the marketplace long before 2016 *used to* value Blaze Advisor: FICO's licenses entered into prior to 2016 and the parties' 2006 agreement. It also accepted that there were alternatives to Blaze Advisor, despite reason to doubt whether Defendants could quickly replace Blaze Advisor (recall, Defendants infringed for four years). App. 192-93; R. Doc. 1284, at 49-50. Nothing in the jury instructions, or the cases discussing the "objective" result that the hypothetical negotiation framework seeks to reach, suggest such a truncated presentation for the jury.

To be sure, the hypothetical negotiation *inquiry* is "objective," asking "not what the copyright owner would like to charge but rather what was the fair market value of the infringing use." App. 178-79; R. Doc. 1284, at 35-36 (citing *On Davis*, 246 F.3d at 166; *Jarvis*, 486 F.3d at 534). But the court distorted the meaning of that unobjectionable point. The law does not allow a copyright holder's actual damages to include things like "'hurt feelings' over the nature of the infringement." *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002); *accord Dash v. Mayweather*, 731 F.3d 303, 312 (4th Cir. 2013). That is, the jury should

not simply choose between one side or another's ideal outcome. App. 179; R. Doc. 1284, at 36 (quoting *Oracle*, 765 F.3d at 1088 ("[W]e do not ask what the owner would like to have charged if unconstrained by reality.")).

Accordingly, a jury should not be *instructed* to simply choose one side's view over the other. Indeed, the jury here was expressly instructed not to choose "a fee either party would have preferred." App. 65; R. Doc. 1167, at 22. But it does not follow that a jury should be blinded to each side's perspective and how much leverage it would have had to cause the opposing side to move in its direction. That would make no sense, and no case so holds.[8]

That is what the evidence the jury heard from Waid provided. As discussed above, Waid explained FICO's actual available pricing

_____

[8] In the analogous patent context, similar evidence is routinely admitted. *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238 (Fed. Cir. 2011) ("the infringer's" and "patentee's profit expectation may be considered in the overall reasonable royalty analysis"); *id.* at 1239-40 (evidence that infringer needed patented product to "maintain [a] competitive advantage" and "prevent[] employee injuries"); *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372-73 (Fed. Cir. 2010) (evidence of patentholder's "strong bargaining position," including value of patented product to defendants and defendants' "demonstrated inability" to separate infringing from non-infringing products).

schemes, how it decided which to propose based on the prospect of long-term business relations, how the market had come to accept Blaze Advisor by 2016, how discounting was decreasing, how FICO had moved to application-based licenses, and how much value FICO understood Blaze Advisor had to Defendants' overall business.

The fact is that the jury heard all of the so-called "objective" evidence that the district court considered powerful, and the jury weighed that evidence differently. The jury, for example, heard all of the evidence about prior licenses, but the jury also heard all of the reasons why those prior licenses were not comparable. That the court was unpersuaded by that evidence does not mean that the jury *had* to be unpersuaded by it also. *See Van Steenburgh*, 171 F.3d at 1160 (the district court "may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable"); *Monohon*, 17 F.4th at 784 (reversing new trial order where the "case had been submitted to the jury under the proper view of the law," but the district court later "changed its view of the law" in ordering new trial).

## 2. *The court erred in concluding Waid's testimony had no probative value to the hypothetical negotiation.*

For all the reasons discussed above, the district court's ruling excluding a significant portion of Waid's testimony was legal error. That exclusion was based on a misunderstanding of the scope of evidence that properly informs the jury's evaluation of how a hypothetical negotiation would have concluded.

The district court excluded the evidence pursuant to Fed. R. Evid. 403. App. 187; R. Doc. 1284, at 44. But that conclusion was wrong. Under Rule 403, relevant evidence may be excluded only if "its probative value is *substantially outweighed* by a danger of," among other things, unfair prejudice or misleading the jury. Fed. R. Evid. 403 (emphasis added). This rule "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case." *Wade v. Haynes*, 663 F.2d 778, 783 (8th Cir. 1981), *aff'd sub nom. Smith v. Wade*, 461 U.S. 30 (1983). Instead, it "protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis." *Id.*

Moreover, because the Federal Rules generally favor admissibility of relevant evidence, *see* Fed. R. Evid. 402, exclusion under Federal

Rule of Evidence 403 "is an extraordinary remedy and should be used sparingly." *Westcott v. Crinklaw*, 68 F.3d 1073, 1077-78 (8th Cir. 1995) (quoting *Hogan v. AT&T Co.*, 812 F.2d 409, 411 n.2 (8th Cir. 1987) (per curiam)). Because of its limited application, Rule 403 is not an appropriate vehicle to exclude whole categories of evidence. *Cf. Gibson, Inc. v. Armadillo Distrib. Enters., Inc.*, 107 F.4th 441, 450 (5th Cir. 2024), *as revised* (Aug. 8, 2024) ("[A] sweeping use of Rule 403 conflicts with the principle that pretrial motions seeking the wholesale exclusion of a class of relevant evidence require careful review.").

Any effort by the district court to treat Waid's testimony as *unfairly* prejudicial to Defendants' case necessarily rests upon an erroneous understanding of the hypothetical negotiation framework. Waid explained the way the actual parties, willing to reach an agreement, would have approached the negotiation in 2016. He described all the commercial circumstances and how valuable Blaze Advisor was to Federal's overall business, which is entirely fair game for the jury. To be sure, the jury did not have to credit Waid's view of how that negotiation would go. But they plainly could and did give it significant weight.

The district court was especially focused on the evidence (and the jury's likely agreement) that the parties would have used application-based pricing in an agreement. App. 203-05; R. Doc. 1284, at 60-62. The court even excluded evidence of such pricing from the second trial in its entirety. May 16, 2024 Pretrial Tr. (D.E. 5495187), at 46:6-8. But the court does not have the authority to displace the jury's role in determining the form that a license would have taken. To the contrary, the form of the agreement arising from the hypothetical negotiation is squarely within the province of the jury. *Gaylord*, 777 F.3d at 1369 (affirming fact-finder's running royalty award instead of lump-sum); *Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900, 916-20 (D. Minn. 2009) (same), *aff'd in relevant part*, 649 F.3d 1336 (Fed. Cir. 2011). This is yet another legal error, one that crosses the line of authority protecting a jury against judicial overreach.

Put simply, the court erred when it declared that "Waid's testimony clouded the jury's understanding of the issues." App. 187; R. Doc. 1284, at 44. What that testimony did, along with the record as a whole, was lead the jury to reach a different conclusion than the district court. *Gaylord*, 777 F.3d at 1369 ("We presume that a fact finder

reviews all the evidence presented unless he explicitly expresses otherwise." (quoting *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed.Cir.1986))); *see also Lovett v. Union Pac. R.R. Co.*, 201 F.3d 1074, 1080 (8th Cir. 2000) (where the jury does not state which facts it considered, speculation about the basis of a jury's decision is not a grounds upon which to hold that the jury was misled). That is no reason to exclude the evidence.

## II.    Even If Remittitur Was Appropriate, FICO Was Entitled to a Reduction to No Less Than ███████████.

A district court that has decided to enter an order remitting a jury's award must ensure that the award is not "for an amount less than the jury could reasonably find." *McCabe*, 608 F.3d at 1081 (quoting *Slatton v. Martin K. Eby Constr. Co.*, 506 F.2d 505, 508-09 (8th Cir. 1974)); *Ouachita Nat'l Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir. 1983) (remanding with direction to modify remittitur that was "erroneously calculated"). Once the court has determined that the jury awarded an unsustainable amount, the role of the court is to remit damages to the "maximum recovery" the record would have allowed the jury to award. *McCabe,* 608 F.3d at 1081. Deciding to remit the award does not permit the district court simply to displace the jury and offer

an award that reflects the district court's own view of the evidence. *See, e.g.*, *Oracle*, 765 F.3d at 1094.

The district court failed to follow these standards. The court determined that an enterprise-wide, perpetual license was the only appropriate license structure and then remitted the award to a $6 million fee for such a license. That figure reflected the district court's view of the maximum amount of the license fee in light of FICO's prior license agreements, which the court purportedly calculated based on the enterprise-wide revenue of Defendants' businesses that Blaze Advisor supported. App. 206-08; R. Doc. 1284, at 63-65. Even accepting that *approach* to calculating damages (and rejecting the jury's application-based award that FICO advocated and the jury accepted), the district court's award excludes significant additional revenue that FICO plainly would have received in the license agreement that the court hypothesized. There are three categories of such erroneous exclusions. First, the district court excluded annual maintenance and support fees, which FICO proved were included in *every* license agreement. Second, the district court refused to include amounts that a license agreement would have included for a development license. Third, the district court

calculated its own license amount based on the wrong enterprise-wide revenue.

After correcting these errors, the proper remitted award under the district court's enterprise-wide framework would have been no less than ███████ in actual damages. If the Court refuses to re-enter the jury's award, at a minimum it should order that amount of actual damages.

## A. The district court failed to include maintenance and support fees all licensees must pay for FICO's product.

The district court excluded a 22% fee for annual maintenance and support that all Blaze Advisor licensees must pay to obtain a Blaze Advisor license. The court reasoned that the law allows only "the [fair market value] of the license, [so] support and maintenance fees are not a factor." App. 207 n.60; R. Doc. 1284, at 64, n.60. The court also stated that the fees were excludable because support was "not the actual use that was made" of the license (because FICO did not provide maintenance and support while Defendants were infringing). Dec. 12, 2023 Hearing Tr. (D.E. 5495183), at 52:2-5.

The district court's view badly distorts the actual damages calculation. The law requires the fact-finder to determine the actual damages FICO is owed based on *all* amounts it would have been paid if Federal and ACE had lawfully licensed Blaze Advisor. 17 U.S.C. § 504(b); 5 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 14.02[A][1] (Matthew Bender, Rev. Ed.). The point of the hypothetical negotiation is to put the copyright owner in the same financial position it would have occupied but for the infringement. That is what the statutory term "actual damages" means. *On Davis*, 246 F.3d at 166; *Flying J*, 45 F. App'x at 766. So the fair market value of Blaze Advisor includes *all* revenues that the record demonstrates Defendants would have paid to obtain the right to lawfully use the software as it did. *See, e.g.*, *Oracle*, 765 F.3d at 1094-95; *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 359-60 (6th Cir. 2007); *Flying J*, 45 F. App'x at 766; *Laspata DeCaro Studio Corp. v. Rimowa GmbH*, 2018 WL 3059650, at *6 (S.D.N.Y. June 20, 2018).

Here, the record regarding maintenance and support fees was clear. The district court recognized that annual maintenance and support fees were a mandatory part of FICO's licensing agreements.

App. 158; R. Doc. 1284, at 15. Those fees were prospective; minimum annual amounts were charged no matter whether or how much support was ultimately used. Trial Tr. 1688:9-25, 1722:5-12. Federal itself paid annual maintenance and support fees under its agreement from 2006 to 2016 and offered to continue paying the fees had a license been agreed to before this suit. App. 528-48; App. 575.

The excluded damages are significant. As the district court recognized, in 2016, the mandatory maintenance and support fees for Blaze Advisor were 22% of the license fee. App. 158, 193; R. Doc. 1284, at 15, 50. Based on other adjustments discussed below, Federal and ACE would have agreed to pay ███████ in annual maintenance and support fees as part of an agreement to license Blaze Advisor. Over the period of infringing use, that amounts to ███████. Under the maximum recovery rule for remittitur, excluding these amounts was legal error.

## B. The district court failed to consider essential development components of FICO's license.

When calculating the enterprise-wide license fee, the Court relied on evidence that addressed only the *deployment* components of Blaze

Advisor, and not the *development* components. Rights to both components are necessary for Blaze Advisor licensees.

The development components are the technical tools used to develop, author, connect, and integrate projects into the deployment environment. Trial Tr. at 1641:2-17. Customers use the development components to build new projects and maintain previously deployed projects, including writing rules. *Id.* 1640:18-1641:17, 1698:18-1699:19. The two components are necessary complements: the development components allow software developers to build and maintain Blaze Advisor projects and write rules, while the deployment components allow customers to launch those projects and rules into production. *Id.* 1640:18-1643:11.

FICO properly presented evidence of all this to the jury. FICO explained that Blaze Advisor's development components are installed on individual programmers' computers, and require per-seat licenses to access the development components. *Id.* 1641:6-1642:4; 209:15-210:2, 1699:7-19. FICO also presented its Global Price List reflecting these fees, which are separate from deployment fees. *Id.* Moreover, the prior licenses (upon which the district court relied) contain development and

deployment components. App. 167-68; R. Doc. 1284, at 24-25 (citing App. 681-935).

The district court derived the $6 million remitted amount from evidence of pricing tiers only for *deployment* licenses. Dec. 12, 2023 Hearing Tr. (D.E. 5495183), at 36:10-15; App. 956. The court stated it would not consider development fees because "the record does not permit sufficient evidence that such use was actually made." Dec. 12, 2023 Hearing Tr. (D.E. 5495183), at 51:23-25.

But, as noted above, the record contained such evidence. Trial Tr. 1642:1-3 ("Developers or programmers that use Blaze Advisor would have [the development license] installed on their development machine where they do their programming[.]"). And regardless, it would not matter even if Defendants did not actually decide to engage in conduct for which they would have needed a development license. Just as with maintenance and support, a development license would have been part of an actual licensing agreement. Moreover, Federal itself purchased unlimited development licenses as part of the 2006 Blaze Advisor agreement, to achieve "ultimate flexibility" with the software and continued to use its development-seat licenses through 2016 to

integrate Blaze Advisor into its technology systems, write rules, and maintain previously deployed Blaze Advisor applications. *Id.* 2415:11-2417:1. The development seats are clearly integral to a licensee's use of Blaze Advisor, and FICO illustrated the seats are integral to Federal's own use. A reasonable jury would have awarded these fees.

The amount at issue is clear. Development licenses are priced based on the number of seats, countries of deployment, and platforms used by the licensee. *Id.* 1641:2-1643:9, 1732:20-1734:16, 1738:22-1740:4. The price for an enterprise-wide, unlimited development license, for one country and one platform, is ███████. App. 956; Trial Tr. 1732:20-1734:16, 1738:22-1740:4. Federal and ACE deployed Blaze Advisor in the United States, Canada, Australia, and Europe which means the development component of the license agreement would have been ████████████████ in additional fees. Trial Tr. 1724:14-1725:10. Further use of Blaze Advisor on two platforms—Java and NET—requires a payment of █████████████████████ for the second, additional platform in each country. *Id.* 1739:15-1740:4. Federal and ACE used the development component on a second platform in two countries—United States and Canada—resulting in an additional

56

████████████████████████████████████. All told, the district court wrongly excluded ███████████ in development license fees supported by FICO's evidence. *Id.* 1738:22-1740:4.

## C. The district court incorrectly valued Federal's and ACE's gross revenue.

The district court also used the wrong figure for Federal's and ACE's gross revenue to calculate the enterprise-wide license fee. The combined revenue at the time of the hypothetical negotiation in 2016, as the district court recognized, was $35 billion. App. 179; R. Doc. 1284, at 36. Even Defendants' evidence shows that the revenue of the relevant enterprise was $35 billion. App. 226. But the court calculated the remittitur amount based on a lower enterprise revenue figure of $32 billion. App. 207; R. Doc. 1284, at 64. That resulted in a deployment license fee that is priced too low. Using the proper amount of annual revenues for Defendants' combined enterprise—$35 billion—produces a deployment license fee of ██████████, not $6 million.[9] App. 956; R. Doc.

---

[9] Based on FICO's Global Price List ███████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████. Based on a
gross revenue of $35 billion, ███████████████████████████████

1310, at 1 n.1 (Defendants' concession that "the remittitur may be adjusted slightly, to █████████ ").

The district court explained at the hearing that, in its view, the difference of $3 billion in revenue was "immaterial," and that "whatever happens … the remittitur amount [was] not going to be █████████ ." Dec. 12, 2023 Hearing Tr. (D.E. 5495183), at 31:7-17. The court declared it "was not using that [revenue number] to set the price," but as a "check" on whether a willing seller would accept $6 million. *Id.* That rationale powerfully evinces how much the district court believed it was its responsibility to employ its own judgment in setting an actual damages amount, rather than search the record to justify the maximum amount the jury reasonably could have awarded.

The court's error is akin to other courts' "difficulty with the mathematics" that has previously formed the basis for this Court's reversal of a remitted amount, with instructions to remand for recalculation. *Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291, 1297 (8th Cir. 1982), *on reh'g*, 716 F.2d 485 (8th Cir. 1983). The court's

████████████████████████████████████████████████

failure to calculate the appropriate license fee based on undisputed

evidence here, similarly requires remand for recalculation under the

correct number consistent with the maximum recovery rule.

*    *    *

Correcting all three errors confirms that under the maximum

recovery rule any remittitur should have resulted in no less than

██████████. At a minimum, an order requiring entry of that award

should issue.

The district court's approach to determining the remitted amount

not only fails to respect the law of remittitur, but also weakens the

actual damages remedy to the point that it *encourages* infringement.

The district court's view is that a copyright infringer may refuse to

accept a license because it does not like the terms that others in the

market have consistently accepted, perhaps because it plans to make

less use of the material than others, or perhaps because it refuses to

pay required fees others pay for access to the material (e.g.,

maintenance and support and development component fees, in this

case). That infringer thus pays *less* by infringing than the lawful

customer pays. The law of damages does not include such a perverse incentive. *See supra*, 29-34.

## III. The District Court Erroneously Denied FICO Disgorged Profits Based on an Incorrect Legal Standard.

When ruling on FICO's request to disgorge Defendants' profits, the trial court imposed a higher standard of causation than required by the Copyright Act. This error infected both the court's judgment and the instructions given to the advisory jury. This Court should vacate and remand for a jury trial on disgorgement under the proper legal standard.

### A. The district court wrongly imposed a greater burden on FICO than is required by the Copyright Act.

The proper standard of causation for disgorgement of a copyright infringer's profits derives from § 504(b) of the Copyright Act. "Statutory interpretation is a question of law," which this Court reviews "de novo." *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 537 (8th Cir. 2006); *see also*, *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 938-39 (8th Cir. 2021) (reviewing "de novo" the district court's formulation of the burden-of-proof in the jury instructions "de novo").

The Copyright Act authorizes copyright owners to recover, in addition to actual damages, "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). The statute expressly distributes the evidentiary burdens between the two parties. "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*

Importantly, the initial burden the law places on the copyright holder is light. Plaintiffs need prove only "*some connection* or relationship between the infringement and the profits he seeks." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 799 (8th Cir. 2003) (emphasis added). That standard requires "a showing of causation that is less stringent than 'but-for' causation." *Furnituredealer.net, Inc. v. Amazon.com, Inc.*, 2022 WL 891462, at *4 (D. Minn. Mar. 25, 2022); *see also Honeywell Int'l Inc. v. ICM Controls Corp.*, 2017 WL 374907, at *5-7 (D. Minn. Jan. 26, 2017) (rejecting onerous reading of § 504(b)). The plaintiff need only differentiate the revenues from the business conduct that was involved with its infringement from those that were not. *See,*

*e.g.*, *Balsley v. LFP, Inc.*, 691 F.3d 747, 769 (6th Cir. 2012) (plaintiff's burden is to prove defendant's gross revenue has "a reasonable relationship—relevance, in other words—to the infringing activity"). Once the plaintiff identifies the revenues that were, in some way, impacted, the burden shifts to the defendant.

The law places the burden on the defendant to apportion "profits between the infringement and other factors." *Andreas*, 336 F.3d at 799. The obligation to back out profits attributable to non-copyrighted features rests squarely on the defendant. The plaintiff does not have to prove "*the extent* to which the infringement contributed to the profits." *Id.*

This framework is by Congressional design. There are many circumstances where copyrighted materials will comprise only a portion of the profits from sales. In a "direct" profits case, which occurs when the defendant sells the copyrighted material itself, *Andreas*, 336 F.3d at 796, an infringer may, *e.g.*, include only one unlicensed work in an anthology. And in an "indirect profits" case, which arises when the defendant infringes the copyrighted material in the course of selling some other product, apportioning profits will often prove even more

complicated. *Id.* at 799. In both circumstances, however, the infringer is in the best position to identify its costs and other contributors to its overall profits. And to the extent a party finds it challenging to apportion contributors to a business's profits, the law places the cost of such uncertainty on the wrongdoer. Any "doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff. If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." *Id.* at 795 (quoting *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985)).

Software cases are commonly indirect profits cases, and courts assessing copyrighted software respect the low causation standard the plaintiff must meet. They require evidence merely that the software played some integral role in the defendants' operations. *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 634-38 (6th Cir. 2020); *see also Berry v. Haw. Express Serv., Inc.*, 2006 WL 1519996, at *5 (D. Haw. May 24, 2006) (connection to revenue where software was "one of the cornerstones" of defendant's operations). As noted above, this is a *lower* standard than but-for causation.

FICO plainly met its statutory burden here. FICO presented evidence of Federal's and ACE's gross revenue from the sale of the lines of insurance business that employed Blaze Advisor. App. 108; R. Doc. 1282, at 3. Notably, it did not present evidence of Defendants' total revenues. It focused exclusively on the insurance policy revenue streams that used Blaze Advisor. It offered the "gross profits" that had "some connection" to the infringement. And, as recited earlier, FICO had presented evidence that Blaze Advisor was a core part of Federal's business, that Federal had made increasing use of it over time, that it had facilitated auto renewals, that the software increased the volume of business Federal could handle, and that it enabled Federal to enter into an entirely new market segment and capture those attendant profits— all of which the district court recognized. App 128-29; R. Doc. 1282, at 23-24. Federal and ACE in fact implemented changes "faster than they had without Blaze" to benefit their policy sales. App 140; R. Doc. 1282, at 35. All of this provides "enough circumstantial evidence to find that" Blaze Advisor "contributed to the profitable" sales of insurance policies, "which [should have] shifted the burden" back to Federal and ACE "of

showing what effect other factors had on its profits." *Andreas*, 336 F.3d at 797.

The district court's ruling awarding zero profits reflects the wrong legal standard. It faulted FICO for failing to explain how its copyrighted material might have attracted Federal and ACE customers, even as it acknowledged that the copyrighted material enabled Federal and ACE to handle a larger volume of business. App. 129-30; R. Doc. 1282, at 24-25. The court explained "[t]hat [FICO's copyrighted material], which purportedly helps increase speed leading to revenue generation, was one part of computer applications helping Defendants sell insurance policies says nothing of the specific contribution to sales made by Blaze" Advisor. App. 130; R. Doc. 1282, at 25. That may be true, but identifying the "specific contribution" of other features was Defendants' job, not FICO's. Defendants chose to put on *no* evidence to meet their burden, yet the district court rewarded that tactic by blaming FICO for the failure.

This Court should vacate and remand for redetermination of disgorgement of profits under an appropriate legal standard.

## B. A jury should determine the amount of profits to disgorge.

The district court also denied FICO its right to have a jury decide its disgorgement award. This Court reviews FICO's Seventh Amendment rights de novo. *See Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co.*, 195 F.3d 368, 374 (8th Cir. 1999). The court's decision to employ an advisory jury is immaterial to this Court's review. Use of an advisory jury constitutes reversible error where the Seventh Amendment requires a binding jury determination. *See id.* at 375; *see also Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 413 n.12 (6th Cir. 2012) (holding advisory juries do not satisfy the Seventh Amendment).

Moreover, the advisory jury could not suffice here because the jury applied the wrong legal standard. The district court told the jury that FICO had to prove a "causal nexus" between the profits the jury would award and the copyrighted material. App. 68; R. Doc. 1167, at 25. That standard failed to capture the low initial burden the law places on the plaintiff.

On the merits of the issue, as the district court recognized, a plaintiff's right to a jury on the issue of disgorgement "has been

squarely addressed by very few courts, none of them within the Eighth Circuit." App. 2; R. Doc. 588, at 2. *See also* Nimmer on Copyright § 14.03[E] (explaining right-to-jury on disgorgement is unsettled). Because "recovery of profits [under § 504(b)] is not easily characterized as legal or equitable," the jury right must be determined case by case. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 668 at n.1 (2014) (cleaned up). Many courts—including the only federal appellate court to have considered the issue—have found that plaintiffs have a right to a trial by jury on disgorgement. *See, e.g.*, *Sid & Marty Krofft TV Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1175 (9th Cir. 1977), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020); *Bertuccelli v. Universal Studios LLC*, 2021 WL 2227337, at *2 (E.D. La. June 2, 2021) (concluding that "reserving the right to jury trial [on disgorgement] is constitutionally appropriate" where nature of remedy is legal and equitable); *Huffman v. Activision Publ'g, Inc.*, 2021 WL 2339193, at *7-8 (E.D. Tex. June 8, 2021) (statutory right to jury on disgorgement); *Capture Eleven Grp. v. Otter Prods., LLC*, 2023 WL 5573966, at *3 (D. Colo. May 31, 2023) (same).

The disgorgement remedy FICO seeks is a legal one. After all, disgorgement is necessary to prevent infringers "from unfairly benefiting from a wrongful act." H.R. Rep. No. 94-1476, at 161 (1976). FICO's pursuit of disgorged profits, together with actual damages, deters infringement and promotes licensing agreements. The "profits premised on damages or deterrence" that FICO seeks thus "create a right to a jury." *Black & Decker Corp. v. Positec USA Inc.*, 118 F. Supp. 3d 1056, 1062 n.9 (N.D. Ill. 2015). *See also Tull v. United States*, 481 U.S. 412, 422 (1987) (holding remedies intended to deter wrongful conduct are legal).

The Supreme Court, too, has indicated that "awards of actual damages and profits, see § 504(b), [] generally are thought to constitute legal relief" supporting a Seventh Amendment right. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 345-46 (1998). This is in part because punitive remedies are legal in nature. *See id.* at 352; *Cass Cnty. Music Co. v. C.H.L.R.*, 88 F.3d 635, 643 (8th Cir. 1996) ("Remedies intended to punish culpable individuals … were issued by courts of law, not courts of equity." (citation omitted)). By disgorging Defendants of their profits obtained after they began infringing, FICO

seeks to divest these Defendants of their ill-gotten gains. That issue should be put to a binding jury, which should be given an instruction consistent with evidentiary burdens stated in the Copyright Act.

Alternatively, if this Court vacates the disgorgement order, but concludes that FICO is not entitled to a jury, FICO respectfully requests that the Court exercise its discretion under 28 U.S.C. § 2106 to reassign the case on remand. The errors permeating the first and second trials, *see supra* 23-25, 39-49, establish grounds for remand. The district court has, since the initial jury award, all but assumed the role of factfinder and has consistently accepted Defendants' view of the evidence. It is likely that the "judge's 'impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts'" of this case. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 667-68 (8th Cir. 2022) (quoting *Sentis Grp., Inc. v. Shell Oil Co.*, 559 F.3d 888, 904 (8th Cir. 2009)).

## CONCLUSION

This Court should vacate the judgment and remand with instructions to reinstate the initial jury verdict of $40 million in actual damages. Alternatively, the judgment should be vacated and the case remanded for FICO to receive an award of ████████. This Court should also vacate the judgment with regard to disgorgement of profits and remand for further proceedings on that issue.

May 20, 2025

*s/ Robert N. Hochman*

Heather Kliebenstein
Rachel Scobie
Paige S. Stradley
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
(612) 332-5300
hkliebenstein@merchantgould.com
rscobie@merchantgould.com
pstradley@merchantgould.com

Robert N. Hochman
  *Counsel of Record*
Nathaniel C. Love
Ellen A. Wiencek
Tyler M. Wood
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
rhochman@sidley.com
nlove@sidley.com
ewiencek@sidley.com
tyler.wood@sidley.com

*Counsel for Fair Isaac Corporation*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i). The brief contains 12,924 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

Date: May 20, 2025          /s/ *Robert N. Hochman*

Heather Kliebenstein
Rachel Scobie
Paige S. Stradley
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
(612) 332-5300
hkliebenstein@merchantgould.com
rscobie@merchantgould.com
pstradley@merchantgould.com

Robert N. Hochman
  *Counsel of Record*
Nathaniel C. Love
Ellen A. Wiencek
Tyler M. Wood
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
rhochman@sidley.com
nlove@sidley.com
ewiencek@sidley.com
tyler.wood@sidley.com

*Counsel for Fair Isaac Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: May 20, 2025                    /s/ *Robert N. Hochman*