# United States Court of Appeals

*for the*

# Eighth Circuit

Case No. 25-1340

FAIR ISAAC CORPORATION, a Delaware corporation,

*Plaintiff-Appellant,*

– v. –

FEDERAL INSURANCE COMPANY, an Indiana corporation;
ACE AMERICAN INSURANCE COMPANY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MINNESOTA, CASE NO. 0:16-cv-01054-DTS
HONORABLE DAVID T. SCHULTZ, U.S. MAGISTRATE JUDGE

## BRIEF FOR DEFENDANTS-APPELLEES
## (REDACTED)

TERRENCE J. FLEMING
LEAH C. JANUS
FREDRIKSON & BYRON
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 492-7000

ANTON METLITSKY
O'MELVENY & MYERS LLP
1301 Avenue of the Americas,
    Suite 1700
New York, New York 10019
(212) 326-2000

LEAH GODESKY
ZACHARY DEKEL
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Century City, California 90067
(310) 246-8588

*Attorneys for Defendants-Appellees*

## SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT

This is a copyright-infringement action brought by Fair Isaac Corporation (FICO) against Federal Insurance Company and ACE American Insurance Company, two subsidiaries of Chubb Limited. The first jury found infringement; awarded $40 million in actual damages; and sitting in an advisory capacity declined to award disgorgement of profits. The district court accepted the jury's disgorgement recommendation but granted a new trial limited to the actual-damages issue, conditioned on FICO rejecting a $6 million remittitur. FICO rejected the remittitur and proceeded to a second trial, where it received $3.725 million in actual damages.

In this appeal, FICO challenges (i) the district court's ruling granting a new trial; (ii) the district court's ruling setting the remittitur amount; and (iii) the district court's rulings related to disgorgement.

Chubb agrees with FICO that oral argument is appropriate in this matter and does not oppose FICO's request that each side receive 20 minutes for oral argument.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellees hereby state that:

Appellee Federal Insurance Company is a wholly owned subsidiary of Chubb INA Holdings LLC. Chubb INA Holdings LLC is owned by Chubb Group Holdings Inc. and Chubb Limited. Chubb Group Holdings Inc. is a wholly owned subsidiary of Chubb Limited. Chubb Limited (NYSE: CB) is the only publicly traded company holding more than a 10% ownership interest in Federal Insurance Company.

Appellee ACE American Insurance Company is a wholly owned subsidiary of INA Holdings Corporation. INA Holdings Corporation is a wholly owned subsidiary of INA Financial Corporation. INA Financial Corporation is a wholly owned subsidiary of INA Corporation, which is a wholly owned subsidiary of Chubb INA Holdings LLC. Chubb INA Holdings LLC is owned by Chubb Group Holdings Inc. and Chubb Limited. Chubb Group Holdings Inc. is a wholly owned subsidiary of Chubb Limited. Chubb Limited (NYSE: CB) is the only publicly traded company holding more than a 10% ownership interest in ACE American Insurance Company.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND STATEMENT REGARDING
ORAL ARGUMENT .......................................................................... i

CORPORATE DISCLOSURE STATEMENT............................................ ii

TABLE OF AUTHORITIES ................................................................. vi

INTRODUCTION .............................................................................. 1

STATEMENT OF JURISDICTION ........................................................ 6

STATEMENT OF THE ISSUES............................................................ 7

STATEMENT OF THE CASE ............................................................... 8

    A.    Background Of The Parties' Dispute ...................................... 8

    B.    The First Trial ................................................................. 11

        1.    Actual Damages .......................................................... 11

        2.    Disgorgement ............................................................. 14

        3.    Verdict and Findings of Fact and Conclusions
of Law .................................................................... 17

    C.    The Court's New-Trial Order and Remittitur ...................... 17

    D.    FICO's Request for Interlocutory Appeal ............................ 20

    E.    The Second Trial and Final Judgment ................................ 20

SUMMARY OF ARGUMENT ............................................................. 21

ARGUMENT .................................................................................. 24

    I.    THE DISTRICT COURT DID NOT ABUSE ITS
DISCRETION IN ORDERING A NEW TRIAL ON
ACTUAL DAMAGES ....................................................... 24

        A.    The Fair Market Value Of A License For The
Infringing Use Is Based On Objective Evidence
Such As Actual Licensing Practices ............................ 25

B.  No Objective Evidence Supported The Jury's
    $40 Million Verdict ...................................... 28

    1.  The Parties' Past Dealings ................................ 28

    2.  Comparable Licenses ........................................... 29

    3.  Comparable Products ......................................... 31

C.  FICO's Contrary Arguments Lack Merit .................... 32

    1.  Evidence of FICO's subjective "value"
        to Chubb ..................................................... 32

    2.  Waid's testimony ................................................ 35

II.  THE DISTRICT COURT'S REMITTITUR WAS NOT
     A MANIFEST ABUSE OF DISCRETION ............................ 38

A.  FICO's Maintenance-And-Support-Fees
    Argument Is Waived And Wrong ................................. 39

    1.  Waiver ................................................... 40

    2.  Merits ................................................... 40

B.  FICO Cannot Recover For Development
    Licenses That Chubb Did Not Require ....................... 44

C.  FICO Cannot Appeal The District Court's
    Refusal To Raise The Remittitur To $6.3
    Million, Which Was In Any Event Well Within
    Its Discretion ................................................. 46

III. FICO'S CHALLENGES TO THE DISTRICT
     COURT'S DISGORGEMENT RULINGS ARE
     MERITLESS ........................................................ 48

A.  The District Court (And Jury) Did Not Clearly
    Err In Concluding That FICO Failed To Carry
    Its Burden To Show That Any Chubb Profits
    Were Attributable To Blaze ................................... 49

    1.  Legal Standard ................................................ 49

    2.  Factual Findings .............................................. 55

  B. FICO's Argument For A New Trial On The
    Ground That It Was Entitled To A Jury On
    Disgorgement Fails For Multiple Reasons ................. 60

    1. Judicial Estoppel ................................. 60

    2. Harmless Error .................................... 63

    3. Merits ................................................. 64

CONCLUSION ........................................................ 66

CERTIFICATE OF COMPLIANCE ....................... 67

CERTIFICATE OF SERVICE................................ 68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters,*
645 F.3d 954 (8th Cir. 2011) .............................................................. 46

*Andreas v. Volkswagen of America, Inc.,*
336 F.3d 789 (8th Cir. 2003) ...................................................... *passim*

*Bell v. Taylor,*
827 F.3d 699 (7th Cir. 2016) .............................................................. 41

*Berry v. Haw. Exp. Serv., Inc.,*
2006 WL 1519996 (D. Haw. May 24, 2006) ...................................... 59

*Buchl v. Gascoyne Materials Handling & Recycling, LLC,*
100 F.4th 950 (8th Cir. 2024) ............................................................ 49

*Complex Sys., Inc. v. ABN Ambro Bank N.V.,*
2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013) ................................. 57-58

*Dash v. Mayweather,*
731 F.3d 303 (4th Cir. 2013) .............................................................. 53

*Davis v. The Gap, Inc.,*
246 F.3d 152 (2d Cir. 2001) ....................................................... *passim*

*Desire, LLC v. Manna Textiles, Inc.,*
986 F.3d 1253 (9th Cir. 2021) ........................................................... 43

*Dupre v. Fru-Con Eng'g Inc.,*
112 F.3d 329 (8th Cir. 1997) .............................................................. 40

*ECIMOS, LLC v. Carrier Corp.,*
971 F.3d 616 (6th Cir. 2020) .............................................................. 59

*Feltner v. Columbia Pictures Television, Inc.,*
523 U.S. 340 (1988) ............................................................................ 65

*Flying J, Inc. v. Central CA Kenworth,*
45 F. App'x 763 (9th Cir. 2002) ................................................... 42, 43

*Ga.-Pac. Corp. v. U.S. Plywood Corp.,*
318 F. Supp. 1116 (S.D.N.Y. 1970) .................................................. 27

*Gaylord v. United States*,
   777 F.3d 1363 (Fed. Cir. 2015) ................................... *passim*

*IBM Corp. v. BGC Partners, Inc.*,
   2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013) ........................ 54, 58, 59

*Ind. Lumbermens Mut. Ins. Co. v.*
   *Timberland Pallet & Lumber Co., Inc.*,
   195 F.3d 368 (8th Cir. 1999) ...................................... 7-8, 63

*Jarvis v. K2 Inc.*,
   486 F.3d 526 (9th Cir. 2007) .............................. 7, 26, 27, 36

*Jones v. Bob Evans Farms, Inc.*,
   811 F.3d 1030 (8th Cir. 2016) ................................... 7, 60-61

*Laspata DeCaro Studio Corp. v. Rimowa GmbH*,
   2018 WL 3059650 (S.D.N.Y. June 20, 2018) ...................... 43

*Lincoln Composites, Inc. v. Firetrace USA, LLC*,
   825 F.3d 453 (8th Cir. 2016) ..................................... 35

*Liu v. SEC*,
   591 U.S. 71 (2020) ........................................... 7, 64, 65

*Mackie v. Rieser*,
   296 F.3d 909 (9th Cir. 2002) .......................... 50, 53, 54, 55

*Miller v. Huron Reg'l Med. Ctr.*,
   936 F.3d 841 (8th Cir. 2019) .................................. 25

*Monohon v. BNSF Ry. Co.*,
   17 F.4th 773 (8th Cir. 2021) .................................. 24

*Nassar v. Jackson*,
   779 F.3d 547 (8th Cir. 2015) .................................. 25

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ......................................... 61, 63

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014) ............................... *passim*

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
   572 U.S. 663 (2014) ......................................... 65

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) ........................................... 52, 55

*Ross v. Kan. City Power & Light Co.*,
    293 F.3d 1041 (8th Cir. 2002) .......................................... 24

*SEC v. Jarkesy*,
    603 U.S. 109 (2024) ........................................................ 64

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
    562 F.2d 1157 (9th Cir. 1977) .......................................... 65

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
    697 F.3d 387 (6th Cir. 2012) ........................................... 64

*Thoroughbred Software Int'l, Inc. v. Dice Corp.*,
    488 F.3d 352 (6th Cir. 2007) ........................................... 41, 42

*Tull v. United States*,
    481 U.S. 412 (1987) ........................................................ 65

*United States v. Condon*,
    720 F.3d 748 (8th Cir. 2013) ........................................... 38

*United States v. Devries*,
    630 F.3d 1130 (8th Cir. 2011) .......................................... 25, 32

*Wright v. Byron Fin., LLC*,
    877 F.3d 369 (8th Cir. 2017) ........................................... *passim*

**Statutes and Other Authorities:**

17 U.S.C. § 504(b) ................................................................ *passim*

28 U.S.C. § 1291 .................................................................. 6

28 U.S.C. § 1292(b) .............................................................. 20

28 U.S.C. § 2111 .................................................................. 47

28 U.S.C. § 1331 .................................................................. 6

28 U.S.C. § 1338(a) .............................................................. 6

28 U.S.C. § 1367(a) .............................................................. 6

5 David Nimmer, *Nimmer on Copyright* § 14.03(E)
(2025 update).........................................................65

6 William F. Patry, *Patry on Copyright* § 22:131
(Mar. 2025 update)................................................53

11 Wright & Miller, *Federal Practice & Procedure* § 2807
(3d ed. May 2025 update) ...................................25

Fed. R. Civ. P. 59(a)(1) ...........................................24

Fed. R. Civ. P. 61 ....................................................47

Fed. R. Civ. P. 68(a) ...............................................19

Fed. R. Evid. 403.....................................................37

Fed. R. Evid. 408.....................................................13

Rule 59(a) ................................................................35

Rule 68 ....................................................................46

**INTRODUCTION**

This case, which has already seen two jury trials, arises from a reasonable dispute concerning the effect of a merger transaction on a pre-existing license for a back-office software product known as Blaze Advisor ("Blaze"). In 2006, Fair Isaac Corporation ("FICO") sold a perpetual, enterprise-wide Blaze license to Federal Insurance Company ("Federal"), a multiline insurer, which used Blaze in a small number of the over 1,000 computer applications in the vast IT systems that supported the sale of its insurance policies. In 2016, Federal's corporate parent (Chubb Corporation) merged with another insurer (ACE Limited) to form Chubb Limited ("Chubb"). FICO and Chubb disagreed on whether the license permitted use of Blaze following the merger, and FICO sued Chubb in early 2016 for breach of contract and copyright infringement. The district court found the license to be ambiguous on that issue, but the jury ultimately agreed with FICO that Chubb's continued use of Blaze violated the license (and that FICO thus properly terminated the agreement in March 2016). Chubb[1] continued

---

[1] On January 1, 2017, Federal's functions were transferred to ACE American Insurance Company, a different Chubb subsidiary, which used Blaze until 2020. Tr. 1231-32. That is why both Federal and ACE

to use Blaze in some computer applications until 2020 because it

believed (incorrectly but reasonably, according to the district court) that

it had not breached the license agreement and so FICO's termination

was improper. In light of the jury's conclusion that FICO had properly

terminated the agreement, Chubb's 2016-2020 use of Blaze constituted

copyright infringement, and FICO sought both actual damages and

disgorgement of profits under 17 U.S.C. § 504(b).

FICO's appeal principally concerns actual damages. All parties

agree that the proper measure of damages is the fair market value of a

Blaze license for the infringing use, i.e., Chubb's use of Blaze from

March 2016 to 2020. Under the uniform view of the appellate courts, a

license's fair market value is the price to which a willing buyer and

willing seller would agree in the open market, and is determined

predominantly based on objective factors, such as the price of similar

licenses and the parties' past practices. Here, the evidence confirmed

that the fair market value for such a license is in the range of a few

million dollars: (i) FICO had previously sold licenses to corporations of

---

American are parties here. But that distinction makes no difference to
this appeal, so this brief uses "Chubb" to refer to both appellees
collectively as well as to the post-merger Chubb enterprise.

similar size to Chubb for between ███████████████████ and

███████, (ii) FICO itself conceded in internal communications

following the merger that it would propose a license price of "3+M" to

Chubb, and (iii) when Chubb replaced Blaze, it paid ███████ for

software that performed the same function as Blaze.

Despite the fact that no customer had ever paid more than ████

███████ for a Blaze license, the first jury awarded $40 million in actual

damages. Holding that $40 million was higher than any plausible

verdict the record evidence could support, the district court

subsequently ordered a new trial on actual damages—subject to a $6

million remittitur. FICO's principal argument on appeal is that the

district court's new-trial grant should be reversed. To prevail, FICO

would have to show an abuse of discretion. But FICO's appeal does not

raise even an arguable error, let alone an abuse of discretion.

FICO's main argument is that the district court unduly discounted

the testimony of one of its own employees that FICO would have

demanded $35 million from Chubb in 2016 to license Blaze. But the

question is not what one party would unilaterally like to demand; it is

the price on which a willing seller and a *willing* buyer would *agree*. And

no actual buyer has ever paid more than a few million dollars for Blaze. The district court did not abuse its discretion in concluding that no willing buyer would ever agree to pay ten times that for a Blaze license (or more than twenty times what Chubb actually paid for a substitute product). Nor did the district court manifestly abuse its discretion in setting a $6 million remittitur—which is still about 50% more than any customer has ever paid for a Blaze license. As explained more fully below, FICO's challenges to the remittitur are waived, meritless, or both.

Seeking a windfall above the already extraordinary license fee awarded by the jury, at the first trial FICO sought *$21 billion* in disgorged profits. It alleged that *every dollar of premium* generated by Chubb through the sale of *any* insurance policy that interacted with *any* computer application that included Blaze as a component was attributable to Blaze, and therefore an ill-gotten gain. Before the first trial, Chubb (unsuccessfully) moved to bifurcate disgorgement, precisely because such outlandish figures would lead the jury to believe that tens of millions of dollars in actual damages was a reasonable "compromise"—which is exactly what happened. In the second trial, when FICO could not reference its $21 billion disgorgement demand,

the jury reasonably awarded FICO $3.725 million, a figure in line with the record evidence.

While its disgorgement presentation may have succeeded in prejudicing the first jury's actual-damages award, FICO's request for disgorgement was nevertheless meritless. At trial, FICO failed to meet its burden under § 504(b) to offer any evidence supporting the claim that any Chubb profits were "attributable to" Blaze. To the contrary, FICO's fact and expert witnesses each admitted that they had no idea what effect, if any, Blaze had on Chubb's ability to sell insurance policies. Accordingly, both the jury (in an advisory capacity) and the court rejected the disgorgement claim. FICO's appeal raises two meritless objections to the district court's disgorgement rulings.

*First*, FICO complains that the district court incorrectly required FICO to show a causal link between Chubb's use of Blaze and its revenue or profit. But that requirement comes directly from this Court's binding decision in *Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789 (8th Cir. 2003), not to mention § 504(b) itself, which only allows disgorgement of profits "attributable to" the infringing use. Each and every FICO witness—including its disgorgement expert—admitted

that they had no idea whether or to what extent Blaze contributed to Chubb's revenue. The district court was right on the law, and did not commit clear (or any) error on the facts.

*Second*, FICO appeals the district court's conclusion that disgorgement is an equitable remedy for which there is no jury-trial right. But that argument fails for three reasons. First, FICO is judicially estopped from making this argument because of inconsistent positions it successfully took below. Second, any error is harmless because the advisory jury (which was not told it was advisory) agreed with the district court that no disgorgement was warranted. And third, recent Supreme Court precedent makes clear that disgorgement-of-profits is an equitable remedy.

The judgment below should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 1367(a). The district court entered final judgment on January 21, 2025. App.[2] 211, R.Doc. 1594, at 1. FICO timely appealed. R.Doc. 1595, at 1. This Court has jurisdiction under 28 U.S.C. § 1291.

_____

[2] "App." refers to the appendix submitted by FICO.

# STATEMENT OF THE ISSUES

**1.** Did the district court abuse its discretion in ordering a new trial on actual damages?

Relevant authorities: *Gaylord v. United States*, 777 F.3d 1363 (Fed. Cir. 2015); *Oracle Corp. v. SAP AG*, 765 F.3d 1081 (9th Cir. 2014); *Jarvis v. K2 Inc.*, 486 F.3d 526 (9th Cir. 2007); *Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001).

**2.** Did the district court manifestly abuse its discretion in setting the remittitur at $6 million?

Relevant authorities: *Wright v. Byron Fin., LLC*, 877 F.3d 369 (8th Cir. 2017).

**3.** Did the district court err in determining that disgorgement of profits is an equitable question that a court can decide, and rejecting FICO's disgorgement demand consistent with the advisory jury's recommendation?

Relevant authorities: *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789 (8th Cir. 2003); *Liu v. SEC*, 591 U.S. 71 (2020); *Jones v. Bob Evans Farms, Inc.*, 811 F.3d 1030 (8th Cir. 2016); *Ind. Lumbermens Mut. Ins.*

*Co. v. Timberland Pallet & Lumber Co., Inc.*, 195 F.3d 368, 375 (8th Cir. 1999).

## STATEMENT OF THE CASE

### A.    Background Of The Parties' Dispute

This appeal arises from a copyright dispute between Chubb and FICO.

**1.**  Before 2016, Federal was an insurer that was a subsidiary of Chubb Corporation.  App. 39; R.Doc. 1072, at 2.  In 2006, it entered into a license agreement with FICO for the use of Blaze, a "rules management software" copyrighted by FICO.  App. 107; R.Doc. 1282, at 2.  Federal paid ███████████ for an enterprise-wide, perpetual license to the Blaze software.  App. 107; R.Doc. 1282, at 2.

In 2016, Chubb Corporation merged with ACE Limited to form Chubb.  App. 107; R.Doc. 1282, at 2.  FICO believed that Chubb's use of Blaze after the merger was a breach of the Blaze license agreement's anti-assignment clause.  App. 147; R.Doc. 1284, at 4.  Chubb disagreed, but FICO purported to terminate the license, effective March 31, 2016.  App. 145; R.Doc. 1284, at 2.  At the time, Chubb was using Blaze in just 15 of its over 1,000 computer applications.  App. 146; R.Doc. 1284, at 3.

Chubb decided to phase out Blaze shortly after the dispute with FICO arose, even as it maintained that its continued use of Blaze was consistent with the licensing agreement and that the agreement had been improperly terminated. Tr.[3] 1147. By 2020, Chubb had stopped using Blaze entirely. Tr. 1051.

In 2016, FICO and Chubb filed suit against each other. App. 146, 148; R.Doc. 1284, at 3, 5. As relevant here, FICO alleged that it properly terminated Chubb's Blaze license, and that Chubb's continued use of Blaze was therefore copyright infringement. Chubb claimed that its use was authorized by the license agreement which FICO improperly terminated. App. 148-49; R.Doc. 1284, at 5-6.

Both parties moved for summary judgment, but the district court held that the license agreement's anti-assignment clause was ambiguous, App. 149-51; R.Doc. 1284, at 6-8, so the case went to trial. The jury found for FICO on this issue. App. 73; R.Doc. 1173. FICO also pressed three other breach-of-contract theories, all of which failed: one was rejected at summary judgment, App. 152; R.Doc. 1284, one was

---

[3] "Tr." refers to the transcript of the first trial in the district court, unless otherwise noted.

rejected as a matter of law during trial, Tr. 2521, and one was rejected by the jury, App. 73; R.Doc. 1173.

**2.** Neither party appeals these liability determinations. Rather, FICO's appeal concerns only remedies—actual damages, and disgorged profits.

FICO sought actual damages under the Copyright Act, *see* 17 U.S.C. § 504(b), in the amount of the fair market value of a Blaze license for the infringing use (i.e., March 2016 to 2020). The jury awarded $40 million, but the trial court found this award to be objectively unreasonable and granted a new trial on actual damages subject to a remittitur of $6 million. FICO rejected the remittitur, and the second jury awarded $3.725 million. FICO appeals both the new-trial ruling and the size of the remittitur.

FICO also sought disgorged profits under § 504(b). The court concluded that disgorgement was an equitable question that the court (rather than the jury) could decide, but at FICO's request, put the question to the first jury in an advisory capacity. Both the advisory jury and the court rejected FICO's disgorgement claim. FICO appeals these determinations as well.

The factual and procedural background relevant to analyzing FICO's appeal is set forth below.

**B.    The First Trial**

*1.    Actual Damages*

**a.**  As the district court explained in a pretrial ruling, "a reliable methodology for determining FICO's actual damages—the fair market value of Blaze Advisor—is to calculate a hypothetical lost license fee based on 'the reasonable license fee on which a willing buyer and a willing seller would have agreed.'" Sep.App.[4] 31; R.Doc. 731, at 31 (quoting *Davis v. The Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001)).  That methodology "is an objective, as opposed to a subjective, inquiry." *Id.*

At trial, Chubb thus focused its damages argument on objective factors bearing on a Blaze license's fair market value.  It noted that FICO priced perpetual, enterprise-wide licenses based on customers' revenues.  App. 956.  As FICO's brief acknowledges, Chubb's revenue was about $35 billion post-merger.  And the record showed that FICO regularly sold or offered similarly-sized companies perpetual,

---

[4] "Sep.App." refers to the appendix submitted by Chubb.

enterprise-wide licenses for amounts ranging from roughly ████████ to roughly ██████, including:

- A ██████ license fee for a company with about $9 billion in revenue, Sep.App. 142-59[5];

- A ██████ license fee for a company with about $14 billion in revenue, Sep.App. 212-50;

- A ████████ contemplated license fee for a company with more than $50 billion in revenue, Sep.App. 251-304;

- A ████████ license fee for a company with tens of billions of dollars in revenue, Sep.App. 305-48;

- An ██████ license fee for a national travel booking company, Sep.App. 189-211;

- A ████████ license-fee offer to a national financial services company, Sep.App. 349-50; and

- A ████████ license-fee offer to a national bank, Sep.App. 160-61.

This license-fee range was confirmed by FICO's own internal communications. On February 5, 2016—after the Chubb/ACE merger was completed—a FICO salesperson integral to the Chubb relationship wrote an internal email confirming that FICO had decided to "ask[] [Chubb] for $3+M" for a perpetual, enterprise-wide Blaze license.

---

[5]   Relevant trial exhibits are not on the district court's docket but are reproduced at Sep.App. 140-350.

Sep.App. 140-59.[6]  What's more, once Chubb transitioned away from Blaze, it paid ████████ to use an alternative software product that was the functional equivalent of Blaze for four years.  Tr. 1159.  Based on this evidence, Chubb urged the jury to award no more than "$3 million" in actual damages if it found infringement.  Tr. 2670.

**b.**  FICO asked the jury to conclude that a Blaze license for Chubb's infringing use was worth about $37 million.  To support that argument, FICO offered only the testimony of "FICO's Chief Product and Technology Officer, Bill Waid," App. 156; R.Doc. 1284, at 13, who testified about what he would like to *demand* for a Blaze license.  Waid speculated that FICO would have sold a per-application license to Chubb rather than an enterprise-wide license.  Tr. 1825.  But he admitted that at the time (i.e., March 2016), FICO had never sold a per-application license to an entity like Chubb, which used Blaze in 15 applications—application-based licenses were limited to customers who

---

[6] Consistent with these communications, after the parties' dispute arose, FICO sent Chubb an offer for a ████████ perpetual, enterprise-wide license or a ██████ perpetual license covering 15 Chubb applications.  Sep.App. 356; R.Doc. 510-15 at 1; *see* Sep.App. 352; R.Doc. 504-8 at 2 (similar).  That evidence was not offered at trial.  *See* Fed. R. Evid. 408.

used Blaze in three or four applications (or fewer). Tr. 1825-26. Yet he nevertheless claimed that "standard pricing" for such a license would be "almost 50 million dollars." Tr. 1823-24. Waid admitted that FICO had no evidence that a "single customer" ever paid anywhere near that much for a Blaze license. Tr. 1824. Indeed, Waid acknowledged that he has access to every Blaze license FICO had ever sold, but could not point to a single one sold for more than ███████. Tr. 1822-28. Nonetheless, FICO asked the jury to rely on Waid's testimony to award damages of roughly $37 million. Tr. 2712.[7]

### 2. Disgorgement

The Copyright Act authorizes a plaintiff who proves infringement to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). FICO sought a disgorgement award of up to *$21 billion*, an amount greater than FICO's own market capitalization at the time the claim was brought.

---

[7] The discrepancy between Waid's $50 million estimate and FICO's $37 million request at closing arguments arose because Waid included foreign-affiliate revenues in his estimate. Tr. 1736. Mid-trial, the court granted Chubb judgment as to the claim that would have allowed FICO to seek foreign-affiliate revenues. Tr. 2521.

**a.** The district court's first ruling relevant to this appeal was that disgorgement is an equitable remedy that the court rather than a jury could decide. App. 37; R.Doc. 811, at 12. Chubb then asked the court to bifurcate trial to exclude disgorgement-related evidence because the egregiously large sum FICO was seeking in disgorgement could easily influence the jury's consideration of actual damages. Sep.App. 369; R.Doc. 900, at 10. FICO opposed bifurcation, arguing that the court should instead use an advisory jury to consider disgorgement issues. Among FICO's reasons: "in the event of an appeal and a decision by the Eighth Circuit that a claim for disgorgement is not equitable, the advisory decision of the jury will avoid a second trial." Sep.App. 410; R.Doc. 910, at 28.

The court agreed with FICO. It denied Chubb's bifurcation request and used an advisory jury on the disgorgement issue to avoid the need for a new trial even if this Court subsequently found disgorgement to be a legal remedy, as FICO argued. Sep.App. 78; R.Doc. 935, at 17. The district court did not inform the jury that its disgorgement findings would be advisory only.

**b.** The second disgorgement-related ruling concerned the causal connection between Chubb's infringing use and its revenues or profits, which FICO must show to prove profits "attributable to the infringement." 17 U.S.C. § 504(b). Over FICO's objection, the advisory jury was instructed that FICO bore the burden to "prove a causal nexus between the revenues Defendants received and the unauthorized use of Blaze." App. 68; R.Doc. 1167, at 25; *see* Tr. 2560-61. The court explained that it drew that instruction from this Court's decision in *Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789 (8th Cir. 2003), which used the terms "causal connection" and "nexus" for the required attribution showing. *Id.* at 796.

At trial, FICO put on no evidence to attempt to prove such a causal nexus. Its witnesses—including its disgorgement expert—testified they were "not in a position to say whether Blaze had any specific impact at all on Chubb's revenue or profit;" that they had "no idea what value, if any, that Blaze has had with respect to Chubb's use of it"; that they "did not endeavor" to opine on "how much, if any," of Chubb's revenue "is actually connected to Blaze"; and so on. Tr. 185, 295, 1349. No witness testified that Chubb had increased revenues as a

16

result of the use of Blaze. Yet FICO urged the jury to award *$21 billion* in disgorgement under § 504(b) based only on the fact that $21 billion in revenue from insurance policies sold by Chubb at some point in their lifecycle touched programs that included Blaze among dozens of other components. Tr. 2721.

3. *Verdict and Findings of Fact and Conclusions of Law*

As relevant here, the jury awarded FICO $40 million in actual damages. App. 74-75; R.Doc. 1173, at 2-3.

Unaware that its verdict on disgorgement was advisory, the jury rejected FICO's disgorgement request. App. 75; R.Doc. 1173, at 3. The court accepted the jury's advice, Tr. 2750, and later entered findings of fact and conclusions of law, finding that FICO had failed to establish "that the use of Blaze contributed to Defendant's revenues." App. 124; R.Doc. 1282, at 19.

C. **The Court's New-Trial Order and Remittitur**

Chubb moved for a new trial on actual damages because the objective evidence of Blaze's value did not support a $40 million award. *See* Sep.App. 79, R.Doc. 1226. The district court agreed and ordered a new trial. It explained that the jury's actual-damages award must be

set aside for "two independent, though related," reasons.  App.179;

R.Doc. 1284, at 36.

First, the court ruled that FICO witness Waid's "calculation

applying FICO's application-based pricing model to Defendants'

unlicensed use of the software was admitted in error and affected the

verdict, which therefore cannot stand."  App. 181; R.Doc. 1284, at 38.

The court noted that Waid's testimony failed to link his "calculation

and methodology to the market for Blaze."  App. 185; R.Doc. 1284, at 42; *see

id.* ("Without some tether between Waid's calculation and an actual

license to use Blaze, that testimony was simply irrelevant to

determining the fair market value of a Blaze license.").  And it held that

the evidence was more prejudicial than probative under Rule 403,

because "it was so untethered from the rest of the evidence bearing on

the license's FMV that it must have misled the jury."  *Id*.

Second, the court held that a new trial would be necessary "[e]ven

if Waid's pricing calculations were properly admitted" because "the

verdict was excessive on the facts and the law."  App. 188; R.Doc. 1284,

at 45.  The court found that the "objective evidence" bearing on the

hypothetical-negotiation framework did not "c[o]me anywhere close to

the $40 million verdict." App. 192, 194; R.Doc. 1284, at 49, 51. "To put in its starkest terms," the court explained, "there is nothing in the record to establish that any willing buyer would ever pay $40 million for a Blaze license to cover the use that was made." App. 205; R.Doc. 1284, at 62.

In the same order, the district court conditioned its grant of a new trial on a remittitur. Examining the record as a whole, it determined that "the highest reasonable license fee for the hypothetical license is $6 million," App. 207; R.Doc. 1284, at 64, and set the remittitur at that amount. This remittitur was more than ██████████ more than FICO had ever been able to charge for any Blaze license.

FICO moved to amend or modify the remittitur order to approximately ██████████. Sep.App. 81, R.Doc. 1296, at 1. Prior to the court's ruling on FICO's motion, Chubb made a formal offer of judgment in the amount of ██████████, Sep.App. 137; R.Doc. 1593, at 13; *see* Fed. R. Civ. P. 68(a), which FICO did not accept. The district court denied FICO's motion. App. 209; R.Doc. 1330, at 1.

In January 2024, FICO informed the court that it planned to reject the remittitur and proceed to a second trial. Sep.App. 102; R.Doc. 1338, at 1.

### D.    FICO's Request for Interlocutory Appeal

FICO then asked the district court to certify its disgorgement rulings for interlocutory appeal under 28 U.S.C. § 1292(b). The court denied that motion. Most relevant here, FICO asked the court to certify for immediate appeal the question whether it had a jury right on disgorgement. Sep.App. 83-84, R.Doc. 1326, at 1-2. The court denied that request for several reasons, including that FICO was "judicially estopped" from appealing and seeking a new trial on that issue because of FICO's "previous assurances that an advisory jury would protect the verdict and ensure against the need for a retrial on disgorgement." Sep.App. 112; R.Doc. 1345, at 9.

### E.    The Second Trial and Final Judgment

The court held the second trial in 2024. Despite the additional opportunity to search for Blaze licenses, FICO *still* introduced no evidence that it had ever sold—or even offered to sell—Blaze for more than ████████. Sep.App. 441-42; R.Doc. 1561, at 18-19. The jury

entered a $3.725 million verdict.  App. 210; R.Doc. 1486, at 1.  Although

FICO's brief complains in passing about evidentiary decisions made

during the trial, *see* Opening Brief ("OB") 23-24, it does not appeal any

errors from the second trial.

## SUMMARY OF ARGUMENT

**I.**  The district court did not abuse its discretion in granting a new

trial on actual damages.

**A.**  Actual damages are calculated as the fair market value of a

license for Blaze—i.e., the price a willing buyer and seller would agree

to in a hypothetical negotiation.  This is an objective inquiry based on

factors such as the price of similar licenses and the parties' past

practices, not what the seller would subjectively like to charge.

**B.**  The objective evidence supports a fair market value for Blaze

of a few million dollars—nowhere near the jury's $40 million actual-

damages award.  For example, after the Chubb/ACE merger closed,

FICO internally concluded that it would demand from Chubb "$3+M"

for a Blaze license.  That is in line with the price FICO previously

charged for Blaze to large companies like Chubb.  And Chubb paid █████

██████ for a four-year license for competitor software to replace Blaze.

The district court did not abuse its discretion in concluding that no willing buyer would pay more than an order of magnitude more for a Blaze license.

**C.** FICO's contrary arguments do not show any error at all in the district court's analysis, let alone an abuse of discretion.

**II.** The district court did not manifestly abuse its discretion in setting a remittitur of $6 million as the maximum fair market value for a Blaze license the evidence could support.

**A.** FICO is wrong that the remittitur should have included what FICO would have charged for maintenance-and-support services. That argument is waived, but it is also wrong—actual damages is calculated as the fair market value of a license for *the infringing use*, and Chubb did not use (because FICO did not provide) maintenance-and-support services for Blaze after March 2016.

**B.** FICO also errs in arguing that the remittitur should have included the value of a "development" license. A "development" license was needed only to do new programming for new applications using Blaze, but it is undisputed that Chubb did not develop any new

applications for Blaze after March 2016, and thus did not require a development license.

**C.** Finally, the Court should reject FICO's contention that the district court abused its discretion in failing to raise the remittitur by ███████ to ███████. FICO cannot make this argument because it previously rejected Chubb's ███████ offer of judgment. And there was no abuse of discretion in any event—if anything, the district court's $6 million remittitur was overly generous, since that is 50% more than anyone had ever paid for a Blaze license.

**III.** FICO's two challenges to the district court's disgorgement-related rulings likewise fail.

**A.** FICO first objects to the district court's legal conclusion that to satisfy its burden to obtain disgorgement-of-profits damages under § 405(b), it must show a causal connection between Chubb's use of Blaze and its revenue or profit. But that requirement was established by this Court's binding decision in *Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789 (8th Cir. 2003), among other precedents. And on the facts, the district court did not clearly err in concluding (as the advisory jury did)

that FICO failed to show any causal connection between Blaze and Chubb's revenue.

**B.** FICO's second argument—that the district court erred in concluding that disgorgement is an equitable remedy, and that a jury trial on disgorgement is thus required—fails for three reasons. *First*, FICO is judicially estopped from making that argument. *Second*, the advisory jury $0 disgorgement verdict renders any error on this judge-versus-jury issue harmless. *Third*, the district court was correct that disgorgement is an equitable remedy.

## ARGUMENT

### I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ORDERING A NEW TRIAL ON ACTUAL DAMAGES.

Civil Rule 59 provides that a "court may, on motion, grant a new trial on all or some of the issues." Fed. R. Civ. P. 59(a)(1). "A new trial is warranted when the outcome is against the great weight of the evidence so as to constitute a miscarriage of justice." *Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 784 (8th Cir. 2021) (quotation omitted). With respect to damages, a court may set aside an excessive damages award that is "unreasonable on the facts[,]" *Ross v. Kan. City Power & Light Co.*, 293 F.3d 1041, 1049 (8th Cir. 2002) (emphasis and quotation

omitted), or that resulted from the jury "misappl[ying]" the law, *Nassar v. Jackson*, 779 F.3d 547, 552 (8th Cir. 2015); *see also Miller v. Huron Reg'l Med. Ctr.*, 936 F.3d 841, 846 (8th Cir. 2019) (new trial warranted "[i]f a trial court determines that a jury award is excessive"); 11 Wright & Miller, *Federal Practice & Procedure* § 2807 (3d ed. May 2025 update) ("[A court] may grant a new trial if the size of the verdict is against the weight of the evidence.").

This Court "give[s] great deference to the district court when it grants a new trial motion on the ground that the verdict is against the weight of the evidence, and ... reverse[s] only upon a strong showing of abuse." *United States v. Devries*, 630 F.3d 1130, 1132 (8th Cir. 2011). Here, the district court acted well within its discretion to grant a new trial, "because there was no evidence that a *willing* buyer and seller would agree to a $40 million price tag for Blaze." App. 191; R.Doc. 1284, at 48.

## A. The Fair Market Value Of A License For The Infringing Use Is Based On Objective Evidence Such As Actual Licensing Practices.

All parties agree that the appropriate measure of damages is "the fair market value of a license covering the defendant's infringing use" of

the copyrighted work, *Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001), which in this case lasted from March 2016 to 2020, *see supra* at 8-9. The critical question for assessing fair market value is "the reasonable license fee on which a willing buyer and a willing seller would have agreed" at the time of the infringement. *Gaylord v. United States*, 777 F.3d 1363, 1367 (Fed. Cir. 2015) (quotation omitted). The plaintiff has "the burden of proving the fair market value of the hypothetical license in question." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014).

Because the hypothetical-negotiation framework is just a tool to determine a license's "fair market value," only "objective considerations" are relevant to the analysis. *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007). "'The question,' therefore, 'is not what the owner would have charged, but rather what is the fair market value.'" *Oracle Corp.*, 765 F.3d at 1088 (quoting *Jarvis*, 486 F.3d at 534). Thus, the trier of fact does not "accept particular practices of the parties on either side," *Gaylord*, 777 F.3d at 1368, or "ask what the owner would like to have charged if unconstrained by reality," *Oracle*, 765 F.3d at 1088. Instead, a court looks to the price a "reasonable business person ... would pay to

license" the work, rejecting "unrealistic[]" valuations submitted by the parties. *Jarvis*, 486 F.3d at 534-35.

The most important evidence in a hypothetical-negotiation case is "past arms-length licensing practices by the copyright owner or the infringer for similar uses," as well as "'benchmark licenses' by others in the industry." *Gaylord*, 777 F.3d at 1368. Thus, "[a]lthough a copyright plaintiff need not ... present evidence of 'benchmark' agreements in order to recover hypothetical-license damages," it is "difficult for a plaintiff to establish the amount of such damages without undue speculation in the absence of such evidence." *Oracle*, 765 F.3d at 1093. That is because "established rates that are regularly paid by licensees" are the best guide to "establishing the fair market value of the license fee." *Davis*, 246 F.3d at 167.[8]

---

[8] In an effort to complicate the evidence relevant to the fair-market-value analysis, FICO relies heavily on a district court patent opinion, *Georgia-Pacific v. U.S. Plywood*. OB 30-34 (relying on *Ga.-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). To the extent *Georgia-Pacific* is inconsistent with the uniform view of the appellate copyright decisions just described, the latter control.

**B.  No Objective Evidence Supported The Jury's $40 Million Verdict.**

The district court properly applied the fair-market-value framework described above and concluded that there was *no* objective evidence supporting a $40 million price for Blaze.

**1.  The Parties' Past Dealings.**  To reach this conclusion, the district court looked first to FICO's past dealings with Chubb.  *See Gaylord*, 777 F.3d at 1368 (endorsing looking to "past arms-length licensing practices").  In 2006, Federal and FICO negotiated a perpetual, enterprise-wide license for ██████████.  App. 192; R.Doc. 1284, at 49.  Post-merger, Chubb was approximately three times larger than Federal was in 2006.  Tr. 86.  So that benchmark would suggest a price of $2 million to $3 million to cover the post-merger entity (depending on whether Chubb received a credit for the existing Federal license).

FICO's internal documents confirm that range.  In early 2016—after the Chubb/ACE merger and just a few months before FICO terminated the license agreement—Russell Schreiber (a FICO salesperson responsible for the Chubb relationship) wrote to a subordinate (Michael Sawyer) expressing concern that Chubb was

acting with "less urgency than maybe we want" in negotiating a new

Blaze license.  Sep.App. 140.  Sawyer responded: "they probably don't

have a sense that we are going to be asking for $3+M" for such a license.

*Id.*  Schreiber confirmed that this email showed that "FICO had decided

that it was going to be asking for more than $3 million in additional

license fees from Chubb."  Tr. 425-26.

If *FICO* had decided to offer Chubb a license for "$3+M" just

before the time of the infringement, then it would be reasonable to

conclude that the actual fair market value of such a license was less

than that—i.e., that a seller's opening offer is higher than the ultimate

negotiated price.  But it is unreasonable to conclude that the fair

market value was *more than ten times higher* than what FICO was

going to request from Chubb in its opening demand.  Yet that is what

the jury did in finding a fair market value of $40 million.

**2.  Comparable Licenses.**  The district court also looked to the

price that actual buyers paid for Blaze, which further corroborates this

fair-market-value range.

The evidence at trial was overwhelming—and undisputed—that

FICO regularly sold Blaze licenses for fees ranging between a few

hundred thousand dollars and a few million dollars. Because a

licensee's revenue is a principal driver of the license price, *see supra* at

11-12, the proper comparison is to Blaze licenses sold or offered to large

corporations like Chubb. And as explained above, each such license

offered at trial cost between ███████ and ███████. *See supra* at 12.

It was FICO's burden to establish a license's fair market value.

*See supra* at 26. And FICO had access to every Blaze license it has ever

sold. If *any* willing buyer had *ever* paid more than a few million dollars

for Blaze, FICO surely would have shown the jury the agreement

reflecting that price. But it did not and could not do so: the best FICO

could do was offer a 2019 agreement under which RGA paid ███████

to use Blaze in one application over a five-year period, and then argue

that because Chubb used Blaze in 15 applications, the license value

should be multiplied by 15. Tr. 1829. But FICO witness Waid admitted

FICO had never sold an application-based license when the client used

the software in more than very few applications (as opposed to Chubb's

15 applications) because such customers purchase enterprise-wide

licenses, Tr. 1825-26, and again Waid admitted that he could not

produce any license ever sold to anyone for more than a few million

dollars, and certainly nowhere close to $40 million.  Tr. 1822, 1824.

There is no way to look at this evidence and conclude that anyone would

have paid $40 million to license Blaze for any period, let alone just four

years.

**3.  Comparable Products.**  "[A]lternatives available to a

potential licensee provide an important constraint in a hypothetical

negotiation," because "'[t]he buyer will not ordinarily pay more for a

license than its anticipated benefit,' a benefit measured relative to

available alternatives."  *Gaylord*, 777 F.3d at 1370 (quoting *Oracle*, 765

F.3d at 1089).  It is undisputed that there are several rules-

management software alternatives to Blaze—FICO's witness

acknowledged, for example, that a product called Drools is "similar to

Blaze," Tr. 606—and Chubb's witnesses confirmed that Chubb's own

engineers could write similar programs, which they did for most

applications, Tr. 689.  And Chubb introduced undisputed evidence that

it paid ██████████ for a four-year Drools license to replace Blaze.  Tr.

1158-59.  Obviously, no reasonable person would pay $40 million for

four years of Blaze when they could purchase a ██████████ Drools

license for the same use.

*     *     *

The district court canvassed this evidence and thought it "plain" that none of it "came anywhere close to the $40 million verdict." App. 194; R.Doc. 1284, at 51. "Absent any evidence that any willing buyer ever had or would pay anywhere near $40 million, the verdict is unreasonable and does not comport with the legal standard." *Id.*

## C.     FICO's Contrary Arguments Lack Merit.

FICO's brief quarrels with little of this analysis. Instead, the first three pages of this portion of FICO's argument insist that Blaze was important to Chubb, but do not attempt to quantify that value. OB 34-37. On the fourth page, FICO finally introduces a dollar sign, relying on Waid's testimony that "a license agreement of roughly $35 million would be the starting point for negotiation." *Id.* at 37. Neither point comes close to a "strong showing" that the district court abused its discretion. *Devries*, 630 F.3d at 1132.

**1. Evidence of FICO's subjective "value" to Chubb.** FICO's brief is larded with adjectives about Blaze's supposed value to Chubb. It insists that Blaze was "central," "pivotal," "important," "desirable," and "valuable" to Chubb. OB 34-35, 40, 47. Those claims were

32

contested at trial: Witnesses testified that Blaze was "not a significant tool" for Chubb; that there was no "functional difference" between it and its competitors; and that Chubb's revenues "didn't change" when it transitioned away from Blaze. Tr. 688, 2086, 2181. Yet FICO nonetheless asserts that Chubb could not have transitioned away from Blaze because of its value to Chubb, such that FICO would have had "leverage" in its negotiations sufficient to extract a $40 million payday. OB 44.

That argument is fundamentally flawed. No one disputes that Blaze has value, which is why customers (including Federal) paid money to license it. But that says nothing about the fair market value of a Blaze license. After all, stamps, iPhones, cars, and multinational corporations have value, but their market value can range from a few cents to trillions of dollars. The actual market price for any particular product is determined by the price at which buyers are actually willing to buy and sellers are actually willing to sell, not by the product-maker's subjective view of its value or by the amount of labor it expended to make the product. *See supra* Part I.A. And as explained above, no one was ever willing to pay more than a few million dollars

for Blaze, and FICO was more than willing to repeatedly sell Blaze at that price (or lower).

That is what the district court held. It explained that FICO's evidence of Blaze's value "establishes that Blaze has a market value but cannot overcome the cold hard fact that no one has ever paid anywhere near $40 million for a license to use Blaze." App. 195-96; R.Doc. 1284, at 52-53. "Nor," the court continued, "can that evidence overwhelm the fact that internally, on the eve of the termination of the contract, which coincides with the timeframe of the hypothetical negotiation, FICO intended to ask for a fee of '3+ million' for [Chubb]'s post-merger use of Blaze." App. 195; R.Doc. 1284, at 53.

In response to this analysis, FICO sets up a strawman. It claims that the district court entirely refused to consider evidence about Blaze's value to Chubb. OB 41-43. But as the quotations above show, that is wrong. The district court looked to the evidence and found that testimony about Blaze's subjective utility could not explain the more-than-$30 million gap between the objective evidence of Blaze's fair market value and the jury's verdict. Even assuming that evidence of Blaze's subjective value to Chubb could be considered substantial

evidence of its fair market value, the district court's conclusion was well within its authority under Rule 59(a) to "weigh the evidence, disbelieve witnesses, and grant a new trial even when there is substantial evidence to sustain the verdict." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 459 (8th Cir. 2016) (quotation omitted).

   **2. Waid's testimony.**  Nor did the district court err in discounting Waid's testimony that FICO would have sought $35 million for Blaze.

   As FICO explains, Waid's testimony concerned what FICO would "propose" for a license for Blaze.  OB 45.  Waid testified that FICO would have sought an "application-based, term license" rather than the sort of perpetual, enterprise-wide license that Federal previously purchased in 2006.  *Id.* at 37.  And he further testified that FICO's initial demand would be "roughly $35 million."  *Id.*  Waid's supposed opening demand would have been $5 million *lower* than the fair market value the jury actually found.  But FICO is undeterred:  it suggests that this opening demand could "result in a lower or higher license agreement" after negotiations, *id.*—including the $40 million fee the

jury awarded—apparently on the theory that a buyer would hear Waid's demand of $35 million but then insist on paying more.

The problem with this evidence, as the district court recognized, is that the fair-market-value framework does not look to what one party or another would "propose." The inquiry turns not on "what the owner would have charged, but rather what is the fair market value.'" *Oracle*, 765 F.3d at 1088 (quoting *Jarvis*, 486 F.3d at 534). "[W]hat the owner would like to have charged if unconstrained by reality" is simply irrelevant. *Id.* So Waid's $35 million testimony would have been relevant to the hypothetical-negotiation framework only if Waid could connect that pie-in-the-sky demand to some evidence that his demand would be accepted. There was no such evidence and the district court properly concluded that Waid's testimony "merely reflects FICO's subjective desire as to what it wishes it could charge for [Chubb's] use, rather than reflecting an objective indicia of Blaze's" fair-market value. App. 204; R.Doc. 1284, at 61. All of the objective indicia show that FICO never sold a Blaze license for more than ███████████.

On appeal, FICO does not seriously grapple with this problem. It insists that Waid's testimony "explained the way actual parties, willing

to reach an agreement, would have approached the negotiation in 2016." OB 47. But Waid's testimony speaks only to what FICO wished it could charge. And not a single word of FICO's brief is responsive to the district court's core holding that there was no "link to an actual license reflecting the methodology Waid employed." App. 204; R. Doc. 1284, at 61. In fact, FICO never explains how Waid's $35 million "starting point" was consistent with the "$3+M" that FICO itself resolved to request from the post-merger Chubb for a Blaze license in 2016; with what FICO received in the market for other licenses; or with what FICO's competitors charged. The district court did not err in recognizing this critical flaw in FICO's case.

Because the district court concluded that Waid's testimony could not support the jury's verdict regardless whether it was admissible, App. 188; R.Doc. 1284, at 45, this Court need not consider the district court's conclusion that the evidence should have been excluded under Rule 403. But there is no basis to disturb that conclusion either. Rule 403 allows a court to exclude evidence "if its probative value is substantially outweighed by a danger" of "unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Such decisions

are reviewed on appeal only "for a *clear and prejudicial abuse of discretion.*" *United States v. Condon*, 720 F.3d 748, 754 (8th Cir. 2013) (quotation omitted). So even if—contrary to the analysis above—Waid's testimony about FICO's pricing desires had some marginal relevance to the hypothetical-negotiation framework, the district court was within its discretion to conclude that the evidence created a "serious risk of misleading or confusing the jury" that outweighed its probative value. App. 187; R.Doc. 1284, at 44. And FICO makes no argument that the jury's award can stand absent Waid's testimony—which, after all, included the only figure remotely close to (but still less than) the jury's $40 million award.

## II. THE DISTRICT COURT'S REMITTITUR WAS NOT A MANIFEST ABUSE OF DISCRETION.

This Court reviews a district court's "remittitur order for a manifest abuse of discretion." *Wright v. Byron Fin., LLC*, 877 F.3d 369, 374 (8th Cir. 2017). The question is whether the remittitur "comports with the 'maximum recovery rule,' under which damages may be remitted only to the maximum amount the jury could have reasonably awarded." *Id.* Only "[w]hen the discrepancy between the remittitur and the maximum amount reasonably supported by the evidence is

apparent and the correction basically mechanical" should "the correction … be made at the appellate level." *Id.* And where a district court's error is "*de minimis*," no reversal is required. *Id.* at 377-78.

The district court carefully complied with the maximum-recovery rule in determining that the "maximum verdict supported by this record is $6 million." App. 206; R.Doc. 1284, at 63. It thought the best view of the evidence was that "a price around $3 million" was a Blaze license's fair market value. App. 207; R.Doc. 1284, at 64. But it looked to the "highest reasonable license fee for the hypothetical license" and so set the remittitur amount at $6 million. *Id.*

FICO's objections to the district court's remittitur are meritless, and certainly come nowhere close to demonstrating a "manifest abuse of discretion." *Wright*, 877 F.3d at 374.

### A. FICO's Maintenance-And-Support-Fees Argument Is Waived And Wrong.

FICO first complains that the district court's $6 million remittitur improperly "excluded a 22% fee for annual maintenance and support that all Blaze Advisor licensees must pay to obtain a Blaze Advisor license." OB 51. That argument is both waived and wrong.

**1. Waiver.** The jury was not instructed to consider maintenance-and-support fees as part of its damages framework. Instead, the court told the jury that "[t]he fair market value is the *license fee* that a willing buyer and a willing seller would have negotiated for the allegedly *improper or infringing use that was made*." Tr. 2615 (emphasis added). The court did not instruct the jury to consider potential bundled fees separate and apart from the "license fee" for the "infringing use."

FICO did not object to that instruction. That ends the matter. The question in determining a remittitur is "the maximum amount the jury could have reasonably awarded." *Wright*, 877 F.3d at 374. The jury could not have awarded maintenance-and-support fees to FICO because it was not instructed to consider those fees in the damages inquiry. And FICO cannot complain about that instruction now, because its failure to "object[] to a jury instruction before the jury retires ... waives the right on appeal to object to a jury instruction on those grounds." *Dupre v. Fru-Con Eng'g Inc.*, 112 F.3d 329, 333 (8th Cir. 1997).

**2. Merits.** Waiver aside, the district court was correct to exclude maintenance-and-support fees. Case after case explains that the proper

remedy for copyright infringement is to award damages equal to "the fair market value of a reasonable *license fee*." *Gaylord*, 777 F.3d at 1368 (emphasis added); *see, e.g.*, *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016) ("hypothetical lost license fee"); *Oracle*, 765 F.3d at 1087 ("hypothetical-license damages"); *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 360 (6th Cir. 2007) ("lost license fee"); *Davis*, 246 F.3d at 159 ("reasonable license fee").

The cases use "license fee" for a reason. The theory of hypothetical-license damages is that an infringer should pay for "the reasonable cost of what he took," *Davis*, 246 F.3d at 166—or, put differently, for the "actual use made by the infringer of the plaintiff's work," *Oracle*, 765 F.3d at 1087 (quotation omitted). In this case, Chubb continued to use Blaze (because it thought it had a right to do so), so the proper measure of damages is the license Chubb would have paid for that use. Chubb did *not* improperly take maintenance and support from FICO—it is undisputed that Chubb received *no* maintenance or support after March 2016, R.Doc. 1335 (D.E. 5495183), at 21—so those fees are rightly excluded from the damages calculation.

No decision holds that this measure of damages should also include fees unrelated to the license fee, like maintenance fees, that the copyright holder would have sought to bundle with the license. Indeed, two of the cases that FICO cites (OB 42) do not address the fee-bundling issue at all. The remittitur calculation discussed in *Oracle* concerns only "lost profits," which is an entirely separate measure of damages, *see infra* Part III: the remittitur explicitly excluded "hypothetical-license damages" because the plaintiff had introduced insufficient evidence to quantify such damages. 765 F.3d at 1093-94. And *Thoroughbred* simply held that a defendant who unlawfully copies a plaintiff's software owes license-fee damages for every illegal copy, whether or not the copies were used. 488 F.3d at 359-60. Neither case supports damages for costs extraneous to the license fee.

FICO's closest case—*Flying J, Inc. v. Central CA Kenworth*, 45 F. App'x 763 (9th Cir. 2002), an unpublished, out-of-Circuit decision— helps Chubb, not FICO. There, the court held that a franchise fee that "commands benefits beyond the copyrighted floor plan" was an appropriate measure of damages because "appellants' own damages expert did not assign specific valuations to the various elements of the

Flying J franchise and was therefore barred from offering apportionment testimony." *Id.* at 766. That analysis suggests that disaggregating the copyright license from the other fees would have been proper had testimony been offered. Here, where FICO itemized license fees and maintenance fees separately, the problem does not arise. *See* App. 158; R.Doc. 1284, at 15.[9]

Indeed, awarding maintenance-and-support fees in this case would improperly "provide [FICO] a windfall." *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1271 (9th Cir. 2021). Maintenance-and-support fees are a charge for real services rendered. When Federal paid maintenance-and-support fees before 2016, it received value in return: trial testimony shows, for example, that FICO spent "up to 6,000 hours" in 2009 to help "configure Blaze Advisor" for a project. Tr. 569. But after 2016, FICO provided no actual maintenance and support to Chubb. FICO is not entitled to receive millions of dollars unrelated to the "actual use" of its product. *Oracle*, 765 F.3d at 1087.

---

[9] The district court decision in *Laspata DeCaro Studio Corp. v. Rimowa GmbH*, 2018 WL 3059650 (S.D.N.Y. June 20, 2018), simply held that there was a "factual dispute to be resolved by the jury" in deciding what fees should be included in a damages award. *Id.* at *6.

**B.    FICO Cannot Recover For Development Licenses That Chubb Did Not Require.**

FICO additionally argues that the remittitur amount should have included fees for Blaze's "*development* components" as well as its "*deployment* components."  OB 53-54.  FICO's witness explained that a development license is "limited to the purposes of writing rules, connecting your Blaze Advisor application to your systems and data and actually generating the deployment that gets eventually put into the servers."  Tr. 1641.  As long as that work has already been done, only a deployment license is needed to "execute or operate, run those rules." Tr. 1642.

The district court properly excluded the cost of development licenses from the remittitur because undisputed testimony showed that Chubb did not need such licenses in the relevant time period.  By 2016, Chubb had decided to phase out Blaze.  Tr. 1149 ("[I]f there was a need to develop an application using a rules engine, IBM ODM would have been the technology of choice.").  So after Chubb merged with ACE, Chubb did not add Blaze to any more applications.  It therefore did not need a development license because there was nothing further to develop.

FICO's responses do not address this fundamental issue. It explains that as a general matter, "programmers" need a development license to "do their programming," but includes no argument that *Chubb's* programmers did any programming involving Blaze after March 2016. OB 55 (quoting Tr. 1642). It notes that Federal purchased development licenses in 2006, but does not include the key context that, by 2016, Chubb had decided to move to different rules-management software. *Id.* Finally, while FICO claims that a development license "would have been part of an actual licensing agreement," it provides no evidence for that assertion. *Id.* And the argument would fail in any event for the reasons discussed above with respect to the maintenance-and-support fees, *see supra* Part II.A—regardless of what other charges might be bundled with a license, the proper measure of actual damages is the fair market value of a license for the *infringing use*, and because Chubb did no development during the relevant period, the market value of a development license is irrelevant.

**C. FICO Cannot Appeal The District Court's Refusal To Raise The Remittitur To ▮▮▮▮▮▮▮, Which Was In Any Event Well Within Its Discretion.**

Finally, FICO complains that the remittitur should have been increased by ▮▮▮▮▮—to ▮▮▮▮▮, as opposed to $6 million— because the district court incorrectly calculated Chubb's gross revenue. OB 57. The revenue calculation, in turn, affected a FICO pricing formula to which the district court looked as a "check" in setting the remittitur. R.Doc. 1335 (D.E. 5495183), at 30; *see* App. 207; R.Doc. 1284, at 64.

FICO cannot make that argument because it declined to accept ▮▮▮▮▮▮ to forgo a second trial. Below, Chubb made a formal offer of judgment in that amount under Rule 68. Sep.App. 137; R.Doc. 1593, at 13. FICO failed to accept that offer and proceeded to a second trial.

Two interrelated legal doctrines prevent FICO from trying to renege on that decision. First, standing: "A plaintiff who causes its own injury does not satisfy the traceability prong" to show standing. *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 961 (8th Cir. 2011). Second, harmless error: "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's

substantial rights." Fed. R. Civ. P. 61; *see* 28 U.S.C. § 2111. Here,

FICO's actions reveal that it would have chosen (and in fact did choose)

a second trial rather than accepting ██████████. Thus, FICO cannot

establish any injury caused by the district court's failure to set the

remittitur at that amount.

Even without that threshold issue, there would be no basis to

override the district court's discretion in declining to adjust the

remittitur by ██████████. For one thing, FICO's complaint is "*de

minimis*," affecting only 5% of the remittitur amount. *Wright*, 877 F.3d

at 377-78.

In any event, the district court here explained that its remittitur

did not depend on Chubb's revenue. Although it used FICO's internal-

pricing calculation as a "check," it did not look to that calculation

exclusively. R.Doc. 1335 (D.E. 5495183), at 30. It looked instead to "all

the evidence in the record" to conclude "that a willing seller would sell

[Blaze] for 6 million." *Id*. And indeed, the district court's conclusion

that the evidence could have supported a $6 million fair market value

for a Blaze license was, if anything, overly generous, since no one had

ever paid anything close to that amount, and FICO itself had

determined to ask for only "$3+M" for the very license that the jury was meant to value. *See supra* Part I. It was entirely reasonable (and certainly not a manifest abuse of discretion) to set the remittitur at $6 million.

## III. FICO'S CHALLENGES TO THE DISTRICT COURT'S DISGORGEMENT RULINGS ARE MERITLESS.

FICO's final arguments concern the jury's and court's decisions to reject its claim for disgorgement. The (advisory) jury found that Chubb's infringing use did not "contribute[] to [its] revenues." App. 75; R.Doc. 1173, at 3. The district court agreed with that finding, ruling that FICO offered "no evidence of a causal nexus between [Blaze's] benefits and [Chubb's] revenue." App. 141; R.Doc. 1282, at 36. Neither of FICO's contentions—that it satisfied its burden to show the requisite connection between Chubb's infringing use and its revenue, and that the jury's $0 disgorgement award should have been binding rather than advisory—warrants reversal.

**A.** **The District Court (And Jury) Did Not Clearly Err In Concluding That FICO Failed To Carry Its Burden To Show That Any Chubb Profits Were Attributable To Blaze.**

FICO first claims that it "met its statutory burden" entitling FICO to disgorgement. OB 64. This Court "review[s] the district court's fact finding for clear error, and ... review[s] legal conclusions and mixed questions of law and fact de novo." *Buchl v. Gascoyne Materials Handling & Recycling, LLC*, 100 F.4th 950, 956 (8th Cir. 2024) (quotation omitted). The district court applied the correct legal standard, and there is no clear error in the court's (and the advisory jury's) conclusion that FICO failed to satisfy that standard.

**1. Legal Standard.** The Copyright Act authorizes a plaintiff to recover "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). As this Court has explained, the statute sets up a burden-shifting regime. First, the plaintiff bears "[t]he burden of establishing that profits are attributable to the infringed work." *Andreas*, 336 F.3d at 796. If it does so, the burden shifts to the defendant to "apportion[] profits between various factors contributing to the profits." *Id.*; *see also* 17 U.S.C. § 504(b). But where a plaintiff cannot "establish any nexus at all between the infringement

and the profits the plaintiff sought," no disgorgement award is proper. *Andreas*, 336 F.3d at 798.

Applying that precedent, the district court held that FICO must "demonstrate a nexus between the infringement and the profits sought." App. 116; R.Doc. 1282, at 11 (quoting *Andreas*, 336 F.3d at 796). The court recognized that it was FICO's burden to show "that the infringing acts had an effect on profits"—or, otherwise said, that FICO must demonstrate a "causal link between the infringement and the subsequent indirect profits"—and that FICO could not obtain disgorgement if it failed to satisfy that burden. *Id.* (quoting *Mackie v. Rieser*, 296 F.3d 909, 915 (9th Cir. 2002)).

FICO asserts that this "causal link" requirement was error, and that instead, FICO's initial burden was to "only differentiate the revenues from the business conduct that was involved with its infringement from those that were not." OB 61. In other words, FICO argues that so long as it differentiated between revenue from policies that ran through applications that included Blaze among their many components and those that did not, FICO did not have to show any causal connection between Blaze and those revenues. OB 64. That

argument is foreclosed by this Court's decision in *Andreas*, and by the weight of out-of-Circuit precedent.

Start with *Andreas*. In that case, Volkswagen was found to have used Andreas's artwork in a commercial for the Audi TT coupe without a license, *see* 336 F.3d at 791-92, and Andreas sought disgorgement of Volkswagen's profits. This Court explained that to satisfy its initial burden, Andreas had to "prove a *causal connection* between the infringement and Audi's profits from the TT coupe." *Id.* at 795 (emphasis added). Put differently, Andreas was required to show that the infringing "commercial *contributed to* sales of the TT coupe." *Id.* at 796 (emphasis added). Thus, it is not enough just to "differentiate the revenues from the business conduct that was involved with its infringement from those that were not," OB 61, as FICO contends. Rather, *Andreas* requires proof that the infringing use had some role in *causing* the revenue.

That much is clear not just from the legal standard set forth by *Andreas*, but from the evidence the Court found relevant to satisfying this standard, all of which was about whether the infringing commercial affected *customers* or *sales*. As the Court explained:

The evidence established that Audi enthusiastically presented the commercial to its dealers as an important and integral part of its launch of the TT coupe into the U.S. market; sales of the TT coupe during the period that the commercial aired were above Audi's projections; the three commercials received high ratings on the Allison–Fischer surveys that rated consumer recall of the commercials; and Audi paid [the advertising agency] a substantial bonus based on the success of the commercials.

336 F.3d at 796-97.

Thus, it would not have been enough for the plaintiff to have "differentiate[d] the revenues from the business conduct that was involved with" the infringing commercial—i.e., revenue from the TT coupe—"from those that were not." OB 61. Rather, the plaintiff was required to offer evidence that the infringing use was important to salespeople or consumers and thus drove revenue. As one court interpreting *Andreas* put it, the crucial evidence there was "that the infringement may have actually influenced the purchasing decisions" of Audi customers. *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 714 (9th Cir. 2004). "*Once a nexus was shown as established*" through this evidence that the infringing commercial caused customers to buy more cars, only then was Andreas "required under the statute … to establish Audi's gross revenue from the TT coupe," *Andreas*, 336 F.3d at 797 (emphasis added), i.e., to "differentiate the revenues" from sales of

the TT coupe from other Audi revenues.  OB 61.  FICO's argument that it can skip the first ("causal link") step and go straight to the second (differentiated gross revenues) step is irreconcilable with *Andreas*.

Nor is *Andreas* alone in establishing this initial "causal link" requirement.  For example, the principal case on which *Andreas* relied was *Mackie*, where the Ninth Circuit held that "a copyright holder must establish the existence of a causal link before indirect profits damages can be recovered," since "there must first be a demonstration that the infringing acts had an effect on profits before the parties can wrangle about apportionment."  296 F.3d at 914-15.  Other courts and commentators agree.  *See, e.g.*, *Dash v. Mayweather*, 731 F.3d 303, 327 (4th Cir. 2013) ("[A] plaintiff must not merely present proof of the amount of the claimed revenue streams, but must also provide more than mere speculation as to the existence of a causal link between the infringement and the claimed revenues." (quotations omitted)); 6 William F. Patry, *Patry on Copyright* § 22:131 (Mar. 2025 update) (plaintiffs must "provide nonspeculative evidence of a causal relationship between the infringement and the profits allegedly indirectly earned as a result of the infringement").

This "causal link" showing is crucial to enforcing the statutory requirement that only profits "attributable to" the infringement (17 U.S.C. § 504(b)) can be disgorged, including in "indirect infringement" cases like this one. When a copyright owner attempts to disgorge "direct profits"—"those that are generated by selling an infringing product" *Mackie*, 296 F.3d at 914—proving that infringement contributed to revenue can be a simple matter, since the infringing product itself was sold, so it is relatively easy to show the causal link between the infringement and the sale. But where, as here, the copyright owner seeks a defendant's "indirect profits," "the profits 'attributable' to the infringement are more difficult to quantify." *Andreas*, 336 F.3d at 796. And it becomes even harder when the indirect infringement is not customer-facing (as the car commercial in *Andreas* was), but instead involves a back-office software component that consumers do not know exists or interact with in any way. *See, e.g.*, *IBM Corp. v. BGC Partners, Inc.*, 2013 WL 1775437, at *4 (S.D.N.Y. Apr. 25, 2013) (no causal link to revenue when defendant "did not market or sell the … software to [its] customers and there is no evidence that its customers cared what software system [it] used"). Yet

the fact that it is difficult to show that indirect profits are attributable to infringement "does not change the burden of proof established by the statute." *Andreas*, 336 F.3d at 796. The "causal link" requirement remains the same, and ensures that a plaintiff cannot disgorge indirect profits that are "only remotely and speculatively attributable to infringement." *Polar Bear*, 384 F.3d at 711 (quotation omitted).

This "causal link" requirement makes "indirect profits awards pursuant to § 504(b) … relatively rare." *Mackie*, 296 F.3d at 913, 915. But that is a consequence of Congress's insistence that only profits "attributable to" the infringement can be disgorged. This Court should reject FICO's invitation to undermine the congressional scheme by allowing it to disgorge profits without showing that Chubb's use of Blaze had a causal connection to Chubb's revenue.

**2. Factual Findings.** FICO does not appear to argue that the district court clearly erred as a factual matter in finding a lack of a causal link if (as *Andreas* and other cases hold) a threshold showing of causation is required. Nor could it. FICO readily admits the *only* evidence it offered regarding disgorgement was "insurance policy revenue streams that used Blaze Advisor." OB 64. FICO does not even

purport to demonstrate a causal connection between use of Blaze and Chubb's revenue. *And every single one of FICO's witnesses admitted that they had no idea whether Blaze had any effect on revenue or profit at all.*

That was uniformly true of FICO's fact witnesses, who repeatedly testified that they were "not in a position to say whether Blaze had any specific impact at all on Chubb's revenue or profit," Tr. 185, or that they had "no idea what value, if any, that Blaze has had with respect to Chubb's use of it," Tr. 295. And, remarkably, it was equally true of FICO's expert witness, Bick Whitener, who FICO presented as the witness who would connect Chubb's use of Blaze to its revenue. Tr. 1538. The district court concluded that Whitener's testimony generally was not credible based on his lack of knowledge and expertise. App. 132-39; R.Doc. 1282, at 27-34. And in any event, Whitener repeatedly conceded his lack of knowledge of Blaze's connection to Chubb's business, App. 135-37, R.Doc. 1282, at 30-32 (district court recounting Whitener's numerous concessions), including his point-blank bottom-line concession that he did not know "whether Blaze actually contributed to any increase in revenue or profit at Chubb." Tr. 1599.

The district court thus committed no clear error in concluding that FICO failed to "establish '*the fact*' that the use of Blaze contributed to Defendant's revenues, as required under the governing law." App. 124-25; R.Doc. 1282, at 19-20.

FICO's response is a non sequitur. It claims, for example, that Blaze was "a core part of [Chubb's] business," that Blaze "increased the volume of business [Chubb] could handle," and that it allowed Chubb to implement unidentified "changes" "faster." OB 64. But the trial court rejected most of these points as a factual matter. App. 128-29; R.Doc. 1282, at 23-24. And in any event, these sorts of generic assertions of a product's value simply do not suffice as a matter of law to satisfy FICO's burden because they do not show any non-speculative connection to revenue or profit. App. 130; R.Doc. 1282, at 25 ("Even assuming Defendants realized Blaze's purported benefits, there was no evidence that those benefits actually contributed—that is, *caused*—any portion of Defendants' revenue.").

Other courts have recognized that evidence that a single piece of software is useful to a business does not suffice to establish the requisite causal link to revenue. *See, e.g.*, *Complex Sys., Inc. v. ABN*

*Ambro Bank N.V.*, 2013 WL 5970065, at *12 (S.D.N.Y. Nov. 8, 2013) (no

causal link to revenue even though defendant's "capacity to provide

trade finances services to its customers was perhaps aided by its use of

BankTrade" because "services provided by ABN are the result of a

number of other factors as well." (citation omitted)); *IBM*, 2013 WL

1775437, at *4 ("[S]imply saying that copyrighted material may have

played an 'important,' 'significant,' or 'meaningful' role is insufficient,

particularly where, as part of [the defendant's] information technology

infrastructure, it comprises only a portion of what enabled [the

defendant] to conduct its business profitably") (quotation omitted).  It

might be different if the plaintiff could show that the particular

software at issue actually drove consumers to purchase the product

(much like the infringing commercial in *Andreas* drove consumers to

purchase the Audi TT coupe, *see supra* at 52).  But FICO offered no such

evidence.  *See, e.g.*, *IBM*, 2013 WL 1775437, at *4.  Nor could it have.

As in *IBM*, Blaze was "back-office" software, 2013 WL 1775437, at

*3—it was installed as one of many software components in several

computer applications that no customer ever interacted with, and which

most Chubb employees did not even know existed.

FICO cites two software cases in support of its argument, but they demonstrate the fundamental shortcomings in FICO's proof. *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616 (6th Cir. 2020), does not appear to have applied the *Andreas* "causal link" requirement. But in any event, in that case "the jury heard ample evidence that the [infringed software], as a whole, was an integral part of [defendant's] quality-control operations *and that any inability to use the system would have resulted in decreased profits.*" *Id.* at 637 (emphasis added). FICO offered no such evidence; its own expert admitted the opposite—that he could not say one way or another whether Blaze contributed to revenue or profit at all. Tr. 1599. And unlike the software in *ECIMOS*, FICO's "software could be replaced without any harm to [Chubb's] business." *IBM*, 2013 WL 1775437, at *3; *see supra* at 31. And in *Berry v. Haw. Exp. Serv., Inc.*, 2006 WL 1519996 (D. Haw. May 24, 2006), a witness testified that the plaintiff's system was necessary for defendant "to earn its sales"; without it, the defendant "'would not earn … $55 million' in sales." *Id.* at *5. That is the type of evidence that none of FICO's witnesses could provide, as the district court concluded. App. 128-30; R.Doc. 1282, at 23-25.

The district court's factual conclusion (consistent with the advisory jury's verdict) that FICO failed to meet its burden of proving a causal nexus between Chubb's use of Blaze and revenue was thus entirely correct, and certainly not clearly erroneous.

**B.    FICO's Argument For A New Trial On The Ground That It Was Entitled To A Jury On Disgorgement Fails For Multiple Reasons.**

Finally, FICO argues that the district court erred in using the jury in an advisory, rather than binding, capacity.  OB 66-69.  That argument fails three times over:  FICO is judicially estopped from making it, any error was harmless, and FICO is wrong on the merits.

**1.  Judicial Estoppel.**  As the district court explained, FICO is judicially estopped from seeking a new jury trial on disgorgement because it successfully argued below that an advisory jury would make a new trial unnecessary even if this Court ultimately concluded that disgorgement was indeed a legal remedy.  Sep.App. 112; R.Doc. 1345, at 9.  FICO cannot press the opposite argument now.

"Judicial estoppel is an equitable doctrine that prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *Jones v. Bob*

*Evans Farms, Inc.*, 811 F.3d 1030, 1032 (8th Cir. 2016) (quotations omitted).  The doctrine applies when a party takes a position that is "clearly inconsistent with its earlier position" and "has succeeded in persuading a court to accept that party's earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotations omitted).  Courts also consider whether the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751.

Here, the application of judicial estoppel is straightforward.  Below, after the court ruled that disgorgement was an equitable remedy for the court to consider, FICO opposed Chubb's motion to bifurcate disgorgement from the remainder of the case by telling the district court that "[t]rying this case in a single trial, with an advisory jury opinion on disgorgement ... ensures no need for a second trial following appeal." Sep.App. 420; R.Doc. 910, at 38.  That was because, according to FICO, "in the event of an appeal and a decision by the Eighth Circuit that a claim for disgorgement is not equitable, the advisory decision of the jury will avoid a second trial."  Sep.App. 410; R.Doc. 910 at 28.  That statement is flatly inconsistent with FICO's insistence to this Court

that the district court's decision that disgorgement was equitable requires a new trial, and that "[t]he court's decision to employ an advisory jury is immaterial to this Court's review." OB 66.

FICO also persuaded the district court of the correctness of its prior position. The court denied Chubb's motion to bifurcate because it agreed with FICO that using an advisory jury would protect the verdict on appeal: "[T]he Court intends to employ the jury in an advisory capacity on the disgorgement claim, providing the Eighth Circuit the benefit of the jury's determination and protecting the verdict should the Eighth Circuit determine that this Court erred in finding disgorgement was not a jury issue." Sep.App. 78; R.Doc. 935, at 17.

And third, FICO's reversal of position is opportunistically calculated to obtain an unfair advantage. FICO was able to avoid bifurcation and thus put an astounding multibillion dollar disgorgement request before the jury charged with deciding its actual damages. The effect of trying the issues together was to anchor the jury to FICO's more-than-$20 billion disgorgement figure such that a large actual-damages award would seem like a reasonable "compromise." *See supra* at 15. FICO cannot now change its position in light of the

"exigencies of the moment" in an effort to retry its losing disgorgement case. *See New Hampshire*, 532 U.S. at 750.

**2. Harmless Error.** Any jury-versus-judge error is also harmless. "The erroneous denial of a jury trial in a civil case is subject to harmless error analysis." *Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co., Inc.*, 195 F.3d 368, 375 (8th Cir. 1999) (quotations omitted). Thus, there is no need for a second trial where a "jury deliberated and decided the case as if it was the final arbiter of the dispute": "under those circumstances," it is "appropriate to give effect that verdict." *Id.*

That holding controls here. The jury was never told that its function was advisory as to disgorgement. It deliberated and found that FICO was not entitled to disgorgement. App. 75; R.Doc. 1173, at 3. So even if FICO were entitled to a jury, the result on disgorgement would have been the same: $0.

FICO has little to say in response. It cites (OB 66) a Sixth Circuit case ordering a new trial on a jury-trial-right error, but the issue there was that "[t]he district judge instructed the jury that its findings on patent misuse would be advisory," and so it was difficult to "speculate"

about whether that instruction "altered the jury's analysis." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 395, 413 (6th Cir. 2012). Here, the jury did not know its verdict was advisory. And while FICO also complains (OB 66) that the jury instructions erroneously told the jury that FICO needed to show a "causal nexus" between Chubb's infringement and its revenue, that argument is wrong for the reasons explained above, *see supra* at 49-55, including that this Court has expressly used both "nexus" and "causal connection" in describing the appropriate standard, *Andreas*, 336 F.3d at 796-97.

**3. Merits.** Given these threshold problems, there is no need for the Court to address whether disgorgement of profits is "legal in nature" and thus for a jury, or an "equitable" remedy that can be decided by the court. *SEC v. Jarkesy*, 603 U.S. 109, 122-23 (2024). But if it does, the answer is easy. The Supreme Court recently held that "disgorgement of improper profits" is "squarely within the heartland of equity." *Liu v. SEC*, 591 U.S. 71, 80 (2020) (quotation omitted).

*Liu*'s holding resolves this question—yet FICO does not even acknowledge it. Instead, it mangles the holdings of several older Supreme Court decisions. OB 67-68. Although FICO claims that

*Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1988), holds that a profit award is legal in nature, the Court said the opposite, describing "actions for monetary relief that we have characterized as equitable, such as actions for disgorgement of improper profits." *Id.* at 352. FICO's reliance on *Tull v. United States*, 481 U.S. 412 (1987), similarly backfires: The Court there explained that "disgorgement of improper profits" is "traditionally considered an equitable remedy." *Id.* at 424. Finally, the Court in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), ruled that the "profits-recovery remedy" was "'equitable' in this case." *Id.* at 668 n.1. No wonder that the treatise FICO cites explains that *Petrella* "leaned towards treating profits on the equitable side of the ledger" and that "[s]ubsequent authority has so held." 5 David Nimmer, *Nimmer on Copyright* § 14.03[E] (2025 update). Meanwhile, FICO's only circuit-level authority held that disgorgement was a "creature of equity" but declined to "continue the past practice" "in a merged system." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1175 (9th Cir. 1977). That methodology has been repudiated by the Supreme Court in *Liu*, 591 U.S. at 80-81, which controls here.

# CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.[10]

Dated: July 21, 2025

Terrence J. Fleming
Leah C. Janus
FREDRIKSON & BYRON, P.A.
60 South Sixth Street
Suite 1500
Minneapolis, MN 55402

Respectfully submitted,

*/s/* Anton Metlitsky

Anton Metlitsky
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, New York 10019
(212) 326-2000

Leah Godesky
Zachary Dekel
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Century City, California 90067
(310) 246-8588

*Attorneys for Defendants-Appellees*

---

[10] If the Court reverses on any issue, there is no basis to "reassign the case on remand"—and particularly not due to alleged "errors" with the "second trial[]." OB 69. If the district court had really committed errors in the second trial worthy of reassignment, FICO presumably would have appealed even one of them. But FICO did not.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, 14-point Century Schoolbook font using Microsoft Word.

<u>/s/ Anton Metlitsky</u>
Anton Metlitsky

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2025, I electronically filed this brief with the Clerk of this Court using the appellate CM/ECF System. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

<span style="margin-left:50%">/s/ Anton Metlitsky</span>
<span style="margin-left:50%">Anton Metlitsky</span>